LOREN DUNN, as Adm'r of the Estate of Reta Bryant, Deceased, Plaintiff-Appellee and Cross-Appellant, v. ILLINOIS CENTRAL GULF RAILROAD COMPANY, Defendant-Appellant and Cross-Appellee (George Shaw, Defendant).

Fourth District   No. 4—90—0606

Opinion filed June 26, 1991.—Rehearing denied July 25, 1991.

Lord, Bissell & Brook, of Chicago, and Craig & Craig, of Mattoon (Hugh C. Griffin, Nancy Shaw, Richard F. Record, Jr., and Kenneth F. Werts, of counsel), for appellant.

Brent D. Holmes and Mitchell K. Shick, both of Heller, Holmes, Hefner & Eberspacher, Ltd., of Mattoon, for appellee.

JUSTICE GREEN delivered the opinion of the court:

On September 12, 1986, plaintiff Loren Dunn, as administrator of the estate of Reta Bryant, deceased, filed suit in the circuit court of Coles County against defendants Illinois Central Gulf Railroad Company (ICG), George Shaw, and Elmer Black. Damages were sought for the allegedly wrongful death of the decedent and funeral expenses incurred as a result of a train, owned and operated by ICG, on its property striking an automobile operated by decedent on October 30, 1984, at Neoga. Subsequently, amendments were made whereby Black was dismissed as a defendant and ICG or Shaw was charged in the first four counts with negligence. In the fifth count, ICG was charged with wilful and wanton violation of section 73 of "An Act concerning public utilities" (Act) (Ill. Rev. Stat. 1983, ch. 111⅔, par. 77) and Illinois Commerce Commission (Commission) regulations pursuant thereto. Punitive damages and attorney fees for plaintiff were requested in that count.

On April 4, 1990, following a jury trial, the circuit court entered judgments on the following verdicts: (1) in favor of defendant Shaw, who was the engineer of the train; (2) in favor of plaintiff and against ICG, finding ICG guilty of negligence and awarding compensatory damages in the sum of $453,048.75 (the jury found total damages in the sum of $604,065 but found the decedent guilty of 25% contribu-

tory negligence which required reduction); and (3) in favor of plaintiff and against ICG for $425,000 punitive damages because of ICG's wilful and wanton violation of the Act and resultant regulations (the jury found total punitive damages in the sum of $500,000 but found decedent guilty of 15% contributory wilful and wanton conduct also requiring reduction). In a post-trial proceeding, the court awarded plaintiff's attorney fees in the sum of $351,219 pursuant to section 73 of the Act.

The jury answered "yes" to a special interrogatory inquiring whether ICG had violated one or more rules of the Commission, or one or more provisions of the Act.

The ICG appeals the portion of the judgments awarding punitive damages and attorney fees. It contends (1) because of the time frame of legislative amendments, plaintiff had no right to recover under section 73 of the Act; (2) the evidence was insufficient to permit the jury to find it guilty of wilful and wanton violation of the Act or Commission regulations; (3) the punitive damages award should have been reduced by 25% rather than 15%; and (4) the attorney fees award was unreasonable. Plaintiff has cross-appealed the same portion of the judgments, maintaining that (1) any reduction of the punitive damages award on comparative fault principles is contrary to public policy; (2) the evidence did not justify any reduction of that award for comparative fault; and (3) in addition to attorney fees, the circuit court should have awarded plaintiff expenses.

At the time of the collision causing decedent's death, section 73 of the Act stated in pertinent part:

"In case any public utility shall do, cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or thing required to be done either by any provisions of this Act or any rule, regulation, order or decision of the Commission, issued under authority of this Act, the public utility shall be liable to the persons or corporations affected thereby for all loss, damages or injury caused thereby or resulting therefrom, and if the court shall find that the act or omission was wilful, the court may in addition to the actual damages, award damages for the sake of example and by the way of punishment. An action to recover for such loss, damage or injury may be brought in the circuit court by any person or corporation.

In every case of a recovery of damages by any person or corporation under the provision of this section, the plaintiff shall be entitled to a reasonable attorney's fee to be fixed by

the court, which fee shall be taxed and collected as part of the costs in the case." (Ill. Rev. Stat. 1983, ch. 111⅔, par. 77.) At that time, section 10.3(a) of the Act included within the definition of the word "[p]ublic utility" any entity

"that owns, controls, operates or manages, within this State *** for public use, any *** property used *** for ***:

(a) the transportation of persons or property." Ill. Rev. Stat. 1983, ch. 111⅔, par. 10.3(a).

The dispute over the right of plaintiff to recover under section 73 of the Act arises from three amendatory acts of the legislature enacted in 1985 during the same General Assembly and all having the effective date of January 1, 1986. ICG maintains the combined effect of this legislation was to nullify the statutory remedy by which plaintiff obtained punitive damages and attorney fees in a proceeding which was initiated after the effective dates of the three acts. ICG contends the legislation did not save statutory rights of action arising under the Act and, accordingly, the new legislation should be given a retroactive effect. (*Clouse v. Heights Finance Corp.* (1987), 156 Ill. App. 3d 975, 977, 510 N.E.2d 1, 2; see *Maiter v. Chicago Board of Education* (1980), 82 Ill. 2d 373, 415 N.E.2d 1034.) Plaintiff denies that the new legislation destroys its rights to seek punitive damages and attorney fees. We agree with plaintiff.

Public Act 84—796 (Pub. Act 84—796, eff. Jan. 1, 1986 (1985 Ill. Laws 4856)) was passed on June 27, 1985, and created an Illinois Commercial Transportation Law (CTL) (Ill. Rev. Stat. 1985, ch. 95½, par. 18c—1101 *et seq.*). The legislation was stated to intend to "facilitate a coordinated approach to regulation of motor carriers, rail carriers" (Ill. Rev. Stat. 1985, ch. 95½, par. 18c—1102(a)). That legislation made no provision for recovery of punitive damages for violation of its provisions of Commission regulations or for the award of attorney fees incident to any recovery for such violations. Public Act 84—796 also amended section 10.3 of the Act to provide that a "[r]ailroad" does not come within the definition of a "[p]ublic utility." 1985 Ill. Laws 4856, 4937-38; see Ill. Rev. Stat. 1985, ch. 111⅔, par. 3—105.

Then, on June 30, 1985, the General Assembly passed Public Act 84—617 (Pub. Act 84—617, eff. Jan. 1, 1986 (1985 Ill. Laws 3980)), which was designated as the Public Utilities Act (1985 Utilities Act) (Ill. Rev. Stat. 1985, ch. 111⅔, par. 1—101 *et seq.*). Section 3—105 of the 1985 Utilities Act, as contained in Public Act 84—617, included railroads within the definition of a "[p]ublic utility" (Ill. Rev. Stat. 1985, ch. 111⅔, par. 3—105; see 1985 Ill. Laws 3980, 3990-91) but, as we will explain, this provision was subsequently removed from the

1985 Utilities Act by Public Act 84—1025 (Pub. Act 84—1025, eff. Jan. 1, 1986 (1985 Ill. Laws 6534)). Section 5—201 of the 1985 Utilities Act (Ill. Rev. Stat. 1985, ch. 111⅔, par. 5—201) contained the same provision for civil damages, including punitive damages and attorney fees, as did section 73 of the Act which was in force until January 1, 1986. Section 4—205 of the 1985 Utilities Act stated, in part:

> "This amendatory Act of 1985 shall not have the effect to release or waive any right of action by the State, the Commission, or by any body politic, municipal corporation, person or corporation for any right or penalty which may have arisen or accrued or may hereafter arise or accrue under this Act or any law of this State." Ill. Rev. Stat. 1985, ch. 111⅔, par. 4—205.

Finally, on October 30, 1985, Public Act 84—1025 was passed. It amended the 1985 Utilities Act in various ways. Section 3—105(a) of the 1985 Utilities Act was amended to strike reference in subsection (a) thereof to the term "[p]ublic utility" including entities engaged in "the transportation of persons or property" (1985 Ill. Laws 6534, 6538; see Ill. Rev. Stat. 1985, ch. 111⅔, par. 3—105(a)). Public Act 84—1025 also added language to section 1—102(d) of the 1985 Utilities Act to set forth a State policy that the 1985 Utilities Act "shall not apply in relation to motor carriers, rail carriers *** as defined in the [CTL]" (1985 Ill. Laws 6534, 6535; see Ill. Rev. Stat. 1985, ch. 111⅔, par. 1—102(d)). Unlike Public Act 84—617, Public Act 84—1025 did not purport to save any right arising under prior legislation.

■ Where, as here, several acts on the same subject are passed during the same General Assembly, the legislative record is open for examination. (*People ex rel. Brenza v. Fleetwood* (1952), 413 Ill. 530, 548, 109 N.E.2d 741, 751.) The most logical explanation for the three acts is (1) the legislature intended to separate the regulation of public transportation from that of entities, such as electric utilities, serving the public in other ways; (2) Public Acts 84—796 and 84—617 were intended to accomplish this; (3) for some reason Public Act 84—617 continued to refer to transportation entities even though this was contrary to the general intent of the General Assembly; and (4) Public Act 84—1025 was revisionary legislation enacted for the purpose of making the 1985 Utilities Act consistent with that intent. That the foregoing was the legislative intent is explained by the statements of the House cosponsors of House Bill 740 (84th Ill. Gen. Assem., House Bill 740, 1985 Sess.), which became Public Act 84—1025, Representative Breslin and Representative Hastert. Representative Breslin explained the bill was for the purpose of reconciling the CTL and the 1985 Utilities Act. (84th Ill. Gen. Assem., House Proceedings, Oct. 30,

1985, at 135 (statements of Representative Breslin).) Representative Hastert explained that reference to transportation entities had remained in the 1985 Utilities Act because of fear that Public Act 84—796 might not pass, leaving railroads and other transportation entities without regulation. 84th Ill. Gen. Assem., House Proceedings, Oct. 30, 1985, at 137 (statements of Representative Hastert).

Thus, the clear legislative intent was to divide regulation between CTL and the 1985 Utilities Act. As the Act was the vehicle by which existing statutory rights of action arose, the 1985 Utilities Act, Public Act 84—617, was the logical vehicle for preserving those rights, which was the aim to be accomplished by the savings clause in section 4—205 of the 1985 Utilities Act to which we have referred. Had the 1985 Utilities Act in its present form, with coverage of railroads and other transportation entities eliminated, been enacted first and with its savings clause, no reasonable argument could be made that any cause of action under section 73 of the Act possessed by plaintiff had been extinguished. Defendant's theory has plausibility only because Public Act 84—617 contained references to transportation entities not intended to be in the final form of that legislation. Furthermore, the significance of Public Act 84—796 being passed prior to Public Act 84—617 is greatly diminished by the fact that both acts took effect at the same time.

■ ■ As correctly cited by plaintiff, section 6 of the Statute on Statutes states:

> "Two or more Acts which relate to [the] same subject matter and which are enacted by the same General Assembly shall be construed together in such manner as to give full effect to each Act except in case of an irreconcilable conflict." (Ill. Rev. Stat. 1989, ch. 1, par. 1105.)

Accordingly, we construe this legislation together in a way to give full effect to each act according to what we have described as the clear legislative intent. We hold that any action which plaintiff had under section 73 of the Act was not extinguished by the three acts or any one of them. Our decision is consistent with the rule that, ordinarily, amendatory acts should be construed to have only prospective application. *Wilson-Raymond Constructors Co. v. Industrial Comm'n* (1980), 79 Ill. 2d 45, 54-55, 402 N.E.2d 584, 589.

The following facts surrounding the tragic collision giving rise to this case are undisputed. The collision occurred on October 30, 1984, a warm and hazy but dry fall day, at approximately 12:14 p.m. Prior to the collision, decedent, Reta Bryant, was traveling north on U.S. Route 45 in Neoga and turned left onto Ninth Street. She then pro-

ceeded across ICG tracks at a speed of approximately 10 miles per hour. Ninth Street was at least a 17-foot-wide oil-and-chip gravel street which intersected the tracks at a 90-degree angle. The crossing was protected only by standard railroad crossbuck signs on each side of the crossing and a sign on the crossbucks which warned of the presence of "two tracks." Also on either side of the crossing on Ninth Street, approximately 28 feet on either side of the crossing, black and yellow warning signs had been placed. Plaintiff's experts agreed the signs were properly placed and maintained. The ICG passenger train which collided with the automobile driven by decedent was traveling in a southerly direction at approximately 80 miles per hour. Decedent had completely crossed the northbound track and had almost completed crossing the southbound track when the back part of the automobile was hit by the engine of the train.

The allegations, which formed the basis for plaintiff's request for punitive damages for violations under section 73 of the Act, were contained in amended count V of the complaint. Plaintiff alleged there that ICG violated valid Commission regulations in that it (1) knowingly failed to construct pavement for the Ninth Street crossing which was 18 feet or greater in width; (2) failed to construct or reconstruct approaches to the crossing which were level for the two feet nearest the crossing and had a grade of no greater than 1% for the next 25 feet from the crossing; (3) failed in the same manner in allowing a grade in excess of 5% for the portion of Ninth Street east of the crossing which was within ICG's right-of-way; (4) failed to clear brush from the right-of-way for a distance of not less than 500 feet from the crossing; (5) failed to construct and maintain the crossing and its approaches in such a way as to make it safe; and (6) knowingly drove and operated the train at an excessive speed. Allegations (3), (4), and (5) were also alleged to set forth violations of section 58 of the Act (Ill. Rev. Stat. 1983, ch. 111⅔, par. 62), which set forth various requirements for railroad grade crossings.

The major thrust of plaintiff's proof of the statutory and rule violations alleged in count V come from the testimony of Dr. John Baerwald, an expert in and retired professor of traffic engineering at the University of Illinois. He testified that, in his opinion, defendant was in violation of each of the statutory and rule provisions. Testimony had been presented that the width of the Ninth Street approach to the crossing from the east, which was entirely on ICG property, was 17 feet rather than 18 feet. He did not give that substantial significance, but indicated that the narrow nature of the approach tended to cause a driver to concentrate more on the possibility of ve-

hicles coming in the opposite direction than of the presence of trains on the track. He recognized evidence that Route 45 was 85 feet east of the east track and that the grade of the track was 10 feet higher than Route 45. Accordingly, the grade of the approach was much steeper than the permissible grade of 5%. He maintained this also tended to cause a driver coming from the east to concentrate upon the difficulty of getting across the track rather than watching for oncoming trains.

Dr. Baerwald also testified that the steep grade of the access diminished the view of the driver approaching the crossing. In assessing the dangerous nature of the crossing as a whole, Dr. Baerwald noted substantial obstruction in the southwest and southeast quadrant of the crossing, consisting of sheds to the south and trees to the north. He explained this did not affect the collision which is the subject matter of this case, but it did bear upon the hazardous nature of the crossing and the reasonableness of requiring that the crossing be closed or flasher lights installed. He also deemed some obstruction to exist as to the decedent's view of the oncoming train had she looked to the north. Photographs of the scene at the time indicate some very low brush on that part of the right-of-way. Evidence introduced at trial indicated brush around the sign warning of two tracks which could have been three or four feet high. However, this brush was not very wide and would not have obstructed the decedent's view to the north as she drove up the approach. Dale Frances, an expert consulting engineer called by plaintiff, admitted no brush on the right-of-way within 500 feet north of the crossing obscured the decedent's view.

Dr. Baerwald testified that in determining the protection necessary at a railroad crossing, consideration should be given to (1) the condition of the approach, (2) the grade of the approach, (3) the width of the approach, (4) the obstructions to view, and (5) the traffic. From information he had obtained concerning the average number of vehicles using the crossing per day and the number of trains using the tracks, he reached an opinion that the crossing was very hazardous. He reached this opinion even though the records indicated that no collision had occurred there in the past five years. Testimony had been presented of several near misses in those five years and of collisions more than five years earlier. He concluded that flasher lights should have been installed or the crossing closed.

The undisputed evidence shows an ICG field engineer had studied the Ninth Street crossing and recommended to ICG that the crossing be closed. Further undisputed evidence showed ICG officials attempted to get Neoga officials to agree to closing of the crossing, but

these officials refused to do so. Apparently, two other crossings were within the Neoga city limits and were protected by flashers and Neoga officials feared these crossings would be too busy if the Ninth Street crossing was closed. They recommended the crossing be protected by lights and gates. Evidence was introduced that ICG officials refrained from seeking Commission permission to close the crossing because of a perceived practice of the Commission to deny closure requests when municipal officials objected. ICG officials did consider installation of flashing lights but rejected the idea.

ICG does not dispute that the foregoing evidence was sufficient to support the determination of the jury that it was guilty of negligence which was a proximate cause of decedent's death. It does not claim error in the judgment for compensatory damages. It disputes that the evidence can support a determination it wilfully and wantonly violated the Act and Commission regulations enacted pursuant to the Act.

In maintaining the evidence supported the award of punitive damages under section 73 of the Act, plaintiff relies most strongly upon the upholding of such awards in *Churchill v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 127, 383 N.E.2d 929, and *National Bank v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 160, 383 N.E.2d 919. In *Churchill*, the defendant railroad had continued to obscure a crossing by storing boxcars on a side track after previous accidents at the crossing and after constant requests by local authorities to refrain from doing so. The crossing was protected by flasher lights, which were in operation. In *National Bank*, the view of the decedent at a crossing without gates or lights was obscured by trees, shrubbery, and a house, all on railroad property, until a vehicle was virtually on the tracks. The engineer of the train striking the automobile carrying the decedent testified he did not see the vehicle until the moment of the collision. Plaintiff also cites the decision of this court in *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 450 N.E.2d 1199, wherein a plaintiff was permitted to recover punitive damages pursuant to section 73 of the Act. The crossing where that collision occurred was shown to have been very defective for a long period of time to the knowledge of the railroad, and the railroad had done nothing to correct it.

ICG points out that in *Mathis v. Burlington Northern, Inc.* (1978), 67 Ill. App. 3d 1009, 385 N.E.2d 780, a directed verdict for the defendant as to a count seeking punitive damages under section 73 of the Act was upheld, even though the defendant railroad had permitted the view of the crossing where a train-car collision occurred to become obscured by large trees on the right-of-way. *Churchill* and

*National Bank* were distinguished on the basis that in *Mathis,* no collision at the crossing or prior complaints as to the obstruction had been made. ICG also calls our attention to *Del Muro v. Commonwealth Edison Co.* (1984), 124 Ill. App. 3d 473, 464 N.E.2d 772, where a judgment *n.o.v.* on a punitive damages award under section 73 of the Act was upheld on review. That defendant had allowed a barbed wire around the enclosure of a substation to fall into disrepair. A seven-year-old boy had been able to climb the fence and climbed onto a transformer from which he received burns resulting in his subsequent death. Although evidence was presented that the defect in the wire had existed for some time, no evidence was presented of complaints to the defendant of the situation. Evidence was presented of a comprehensive safety program of the defendant. The *Del Muro* court stated that the proof necessary to support a section 73 award of punitive damages is the same as that under a common law wilful and wanton charge. *Del Muro,* 124 Ill. App. 3d at 481, 464 N.E.2d at 778.

■ The most significant case cited by ICG is the recent decision of the supreme court in *Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 563 N.E.2d 397. There, a punitive damages award in favor of a user of a shotgun and against the manufacturer of the gun was set aside. The gun barrel had exploded when fired, injuring the plaintiff. Evidence was presented of 94 other instances of other barrel explosions in the manufacturer's shotguns, and in a prior case against that defendant, an expert witness for that plaintiff had testified to the existence of the defect claimed by the plaintiff in the case before the court. The *Loitz* court stated that punitive damages are not favored in the law, citing various cases, the most recent of which is *Deal v. Byford* (1989), 127 Ill. 2d 192, 537 N.E.2d 267. *Loitz* recognized concerns have arisen over the proliferation of punitive damages awards, as exemplified by the legislative concern shown by the enacted prohibition against such awards in medical and legal malpractice cases. (Ill. Rev. Stat. 1987, ch. 110, par. 2—1115.) The *Loitz* court then set forth the requirements for an award of punitive damages in these words:

> " 'Since the purpose of punitive damages is not compensation of the plaintiff but punishment of the defendant and deterrence, these damages can be awarded only for conduct for which this remedy is appropriate—which is to say, conduct involving some element of outrage similar to that usually found in crime. The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others.' (Restatement (Second) of Torts §908, comment *b,* at 464-65 (1979).)

In this context, willful and wanton misconduct ' "approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it." ' *Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill. App. 3d 445, 457[, 501 N.E.2d 830, 839]." *Loitz,* 138 Ill. 2d at 415-16, 563 N.E.2d at 402.

We examine the conduct of which the jury could have found ICG guilty in light of the quoted *Loitz* language. Clearly, the knowing failure to widen the approach to the crossing by an additional one foot falls far short of being a significant part of the elements described in *Loitz.* Various photographs introduced in evidence make clear that shrubbery on the right-of-way to the north of the crossing had little to do with the decedent's ability to see the train coming from that direction at 80 miles per hour. The only growth of any size was around the warning sign and might have obscured the view when the vehicle was parallel to the sign. Unquestionably, the steepness of the approach to the tracks from Route 45 impaired the decedent's ability to see the oncoming train. However, considering the grade of Route 45 and that of the track, and the short distance between them, ICG had little reasonable practical opportunity to remedy the steepness of the approach.

Thus, the only things ICG could have done to substantially improve the ability of the decedent to have avoided the collision would have been to obtain permission to close the crossing or to install lights or gates. Especially considering the objection of the City of Neoga to the closure of the crossing, we do not deem the failure of ICG to seek Commission approval for closing the crossing to come close to a requirement of *Loitz* for establishment of wilful and wanton conduct. Accordingly, we are left with the question of whether the failure of ICG to install flashing lights or crossing gates at the Ninth Street crossing could be the basis of the punitive damages award.

In determining the culpability which could be assessed against ICG for not providing lights or gates, we must consider other items of evidence which were not otherwise material. Evidence was introduced of substantial obstructions to view on the west side of the tracks. Although these were no impediment to the decedent, they do bear upon the strength of a need for lights or gates and the degree of culpability the jury could assess for failure of ICG to do so. Likewise, evidence of the number of trains passing through Neoga, the number which were fast passenger trains, and the number of people using the crossing was significant. Dr. Baerwald testified these factors strongly indicated

the need for lights. He also indicated the crossing was rendered more hazardous because vehicles came off of Route 45, which was a busy highway, and then with only a short time for the drivers to change their attention from the highway to the tracks, reached the railroad tracks.

■ We recognize that while, as Dr. Baerwald testified, installation of lights at a crossing may reduce the chances of collisions with trains by as much as 80%, lights do not eliminate the hazard. In *Churchill*, the crossing was protected by flashing lights which were in operation at the time of the collision. ICG may have concluded that attempting to obtain agreement with the City of Neoga to close the crossing was the best route to follow in view of the problems at the crossing. In any event, we find any fault upon the part of ICG in not installing lights or gates falls short of that " 'which is to say, conduct involving some element of outrage similar to that usually found in crime,' " as required for wilful and wanton conduct in *Loitz*. The judgment for punitive damages must be set aside.

As the punitive damages award is being set aside, we need not consider to what extent, if any, such an award should be reduced by fault of the plaintiff.

The circuit court awarded plaintiff $351,219.50 in attorney fees. This sum was 40% of plaintiff's total recovery of $878,048.75. Evidence was presented that plaintiff had entered into a contingent-fee contract whereby his attorneys were to receive one-third of the recovery which could be obtained without suit or 40% of the recovery resulting from litigation. Evidence was presented that this was a usual, customary, and reasonable contract. Defendant objects to the amount of the fee because it amounts to a very high rate for the 620.95 hours of work stipulated by the parties to have been performed by plaintiff's counsel. Defendant does recognize that any reduction or elimination of the punitive damages award would reduce the fees under the contract accordingly.

In *Renken v. Northern Illinois Water Co.* (1989), 191 Ill. App. 3d 744, 547 N.E.2d 1376, this court passed upon the propriety of an attorney fee awarded under section 5—201 of the 1985 Utilities Act (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 5—201), successor to section 73 of the Act, in regard to the type of utility involved there. Attorneys working under a one-third contingent-fee contract had recovered a net of only $2,183.70 for their client, but the circuit court awarded them $8,162.50 in fees. This was based upon 65.3 hours of work performed by those attorneys at an hourly rate of $125 per hour. This court upheld the award, stating "courts are not to rely arbitrarily on a contin-

gency arrangement as the standard for determining a reasonable attorney fee." (*Renken*, 191 Ill. App. 3d at 752, 547 N.E.2d at 1381.) This court concluded that a contingency-fee contract is but one of the factors to consider in determining an appropriate fee, but that "where a contingency fee represents the standard remuneration for the type of case involved, the contingency fee may adequately serve as the final award." *Renken*, 191 Ill. App. 3d at 752, 547 N.E.2d at 1381.

■ Before awarding the fee, the circuit court heard testimony indicating that a contingent-fee contract was the method for attorney compensation for plaintiff's attorneys in almost all tort cases and that railroad crossing cases were considered to be hard to win. Nothing in our decision in *Renken* precluded the circuit court from opting to make an award on the basis of the contingent-fee contract even though, as the case turned out at the trial level, the award was very high on an hourly rate. The reliance on the contingent-fee contract was not arbitrary. However, because of our decision reversing the punitive damages award, we must remand for a new determination as to fees.

■ In passing upon plaintiff's cross-appeal, we need not consider plaintiff's contention that any reduction in the punitive damages award on comparative fault principles is contrary to public policy as we have determined no punitive damages award should have been made. For the same reason, we need not decide whether the evidence justified any reduction. Plaintiff is unable to cite any authority to support its request for expenses in addition to attorney fees. Even where a statute has authorized some recovery of expenses of litigation, this court has indicated "litigants should not be permitted to recover as costs items other than those *specified* in the statute authorizing such awards." (Emphasis added.) (*Calcagno v. Personalcare Health Management, Inc.* (1991), 207 Ill. App. 3d 493, 502, 565 N.E.2d 1330, 1336.) We do not deem these expenses to be a component of attorney fees. No recovery of attorney fees or expenses of litigation is permitted by the common law. (*Ritter v. Ritter* (1943), 381 Ill. 549, 553, 46 N.E.2d 41, 43.) Statutes permitting special remedies in derogation of the common law "are to be strictly construed" and "[n]othing will be read into such statutes by intendment or implication." (*In re Special Education of Walker* (1989), 131 Ill. 2d 300, 304, 546 N.E.2d 520, 522.) Plaintiff is not entitled to expenses of litigation.

■ Although ICG does not argue that any error occurred in regard to the judgment for compensatory damages, defendant has appealed all judgments against it. Accordingly, we affirm the judgment in favor of plaintiff and against ICG for compensatory damages in the

sum of $453,048.75 and reverse all other judgments against ICG. We remand the cause to the circuit court of Coles County for the sole purpose of determining attorney fees to be awarded to plaintiff and against ICG.

Affirmed in part; reversed in part and remanded.

STEIGMANN and McCULLOUGH, JJ., concur.