RACHEL BARTON, Plaintiff-Appellee, v. CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, n/k/a The Union Pacific Railroad Company, *et al.*, Defendants-Appellants.

First District (5th Division)   No. 1—99—2285

Opinion filed September 14, 2001.

O'BRIEN, J., concurring in part and dissenting in part.

Clausen Miller P.C. (James T. Ferrini, Barbara I. Michaelides and Lisa Marco Kouba, of counsel), and Williams & Montgomery, Ltd., both of Chicago, for appellant.

Clifford Law Offices, of Chicago (Robert A. Clifford, Kevin P. Durkin, David A. Novoselsky, Kevin M. Forde, Robert C. Sheridan, and Leslie J. Rosen, of counsel), for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff Rachel Barton filed suit against defendants Chicago & North Western Transportation Company, n/k/a the Union Pacific Railroad Company (CNW),[1] and the Northeast Illinois Regional Commuter Railroad Corporation (NIRCRC), alleging that she was dragged by a train because defendants did not have a proper procedure to determine whether a passenger was caught in the train's doors before

---

[1]The CNW merged with the Union Pacific Railroad Company in October 1995.

leaving a station.[2] Following a jury trial in the circuit court of Cook County, defendants were found liable to plaintiff on the claims brought against each of them. The trial court denied defendants' posttrial motions. Defendants timely filed a notice of appeal to this court.

The record on appeal discloses the following facts. NIRCRC is a corporation maintained, supervised and directed by the Commuter Rail Board (CRB), the governing body of the Commuter Rail Division (CRD) of the Regional Transportation Agency (RTA) under the Regional Transportation Authority Act (RTA Act) (70 ILCS 3615/2.20(a)(xii), 3B.01, 3B.02 (West 2000)). Defendants' brief states that "[t]he CRD/NIRCRC are known to the public through the service mark 'Metra.' "[3]

The CRB may provide public transportation by operating facilities or through purchase of service agreements (PSAs) with other transportation agencies. See 70 ILCS 3615/2.01, 2.03 (West 2000). The CRD and CNW entered into a PSA. Article II, section 2.04, of the PSA states in part that the CRD may, at any time, direct changes in contract standards. Article I of the PSA defines "Standards" as "the standards specified in Exhibit 2-C." Exhibit 2-C states in part as follows:

"1. *SAFETY*

The Contract Services shall be operated or provided by [CNW] in accordance with the applicable standards of safety established by any agency of the Federal Government or the State of Illinois, and any other standards established by the [RTA] pursuant to Section 2.04 of this Agreement. [CNW] shall maintain its existing practices and procedures *** for the safety of its passengers, employees and property used in providing the Contract Services ***."

Article IV, section 4.01, of the PSA states in part that CNW is an independent contractor for the CRD and shall have managerial control with respect to the contract services. The PSA was in effect through December 31, 1998.

Plaintiff Rachel Barton, born in October 1974, began playing the

---

[2]Plaintiff's brief states that Barton was dragged 366 feet. Although defendants do not appear to dispute this figure, it is not supported by the record citation in plaintiff's brief.

[3]The defendants do not cite the record in support of this statement. However, NIRCRC was sued as Metra in *Ramirez v. Village of River Grove*, 266 Ill. App. 3d 930, 641 N.E.2d 7 (1994). The CRD was sued as Metra in *Wehde v. Regional Transportation Authority*, 237 Ill. App. 3d 664, 604 N.E.2d 446 (1992). As defendants have chosen to treat the CRD and NIRCRC as interchangeable in this case, this court will adopt a similar convention in referring to Metra.

violin when she was 3½ years old. By the time she was 11 years old, Barton was practicing eight hours daily and had joined the Civic Orchestra in Chicago, which trained people to be concert masters in professional orchestras. When Barton was a teenager, she would go dancing on Friday and Saturday nights; she began dating at age 14. Barton engaged in local, national and international violin competitions. Barton paid her living and musical expenses and would travel alone. When Barton's instruction ended at age 17, she spent more time with friends and family. She hoped eventually to get married and have children.

At age 18, Barton had left the Civic Orchestra and was playing with the Grant Park Symphony and the Lyric Opera Orchestra, as well as substituting for ill members of the Chicago Symphony Orchestra. Barton began giving violin lessons at the Music Center of the North Shore in Winnetka (MCNS). Barton's compact disc of Spanish classical music was released at the end of 1994.

On January 16, 1995, at 10:30 a.m., Barton boarded the last car of CNW northbound train No. 317 at the Ravenswood stop in Chicago. She was going to teach at MCNS. Barton was wearing jeans, a T-shirt, possibly a flannel shirt, a bulky sweater with shoulder pads, a puffy down coat with fashion shoulder pads, gym shoes, earmuffs and thin leather gloves.

Barton was carrying a book bag, her purse and a food bag. Barton also was carrying a violin in a "cushy case" that insulated it from the cold. The violin was loaned to Barton by her patron and insured in the amount of $500,000.[4] Barton testified that she was carrying these items on her shoulder. According to Barton, these items would not slip down her shoulder, due to the puffiness of her coat. Barton stated that she routinely carried her items in the following order: purse, violin, book bag, food bag.

During the trip, Barton removed her gloves and worked on student reports. Barton testified that she noticed that the Winnetka stop was coming up, based on her knowledge of the prior stops. Barton stated that the train was still moving when she loaded up her belongings but had stopped by the time she reached the vestibule of the car. Dr. Caro-

---

[4]Barton testified that the violin was handmade in Italy by the Brothers Amati, the sons of Andrea Amati, who some think invented the violin in the late 1500s. The Brothers Amati were also the uncles of Nicola Amati, who taught violin-making to Antonio Stradivarius. Barton later testified that when she was 14, she had lost a violin that had been a birthday present from her grandmother by leaving it in a taxicab. That violin, which was insured, was valued at $6,500.

line Clements, who was riding in the same car, heard Barton ask whether the stop was Winnetka. Dr. Clements thought that Barton would not be able to exit the train in time, but stated that the train had not stopped when she entered the vestibule.

Barton testified that her purse, violin case, briefcase and food bag were all on her left shoulder. As she tried to descend the stairs, the violin case became caught on one or two poles in the vestibule. According to Barton, while she tried to keep her belongings at her side, the violin case had "jostled sort of in back of" her. Barton stated that she took a step back, reorganized her belongings, descended the stairs and stepped off the train.

As Barton stepped onto the platform, she could hear "ambient train noise." Barton testified that she did not see or hear the train doors close, but felt and heard a bump. Barton attempted to take another step, but was unable to complete it. Barton thought that her violin case had become caught again. Barton testified that it was as if her left shoulder was pinned to the train. Barton could not turn to the right, so she began to turn to the left. Barton stated that she was bowed backwards because her feet were on the edge of the platform. As she turned her head, Barton could not see her violin case and deduced that it must have been inside the train.

Barton testified that based on her experience riding on Chicago Transit Authority (CTA) trains, she tried to spring open the train doors. Barton stated that it was difficult to get her right hand into the rubber where the doors met, given her body position. Barton could not see a door handle. Barton got a palm on the right door, but her hand slid down the door. Meanwhile, Barton was saying, "Hey, wait. Hey, open up the doors," thinking someone would hear her. Theresa Croghan, who was jogging on the opposite side of the train at the time, heard a very annoyed voice say, "Wait. Wait. Wait a minute. Wait a minute." Barton stated she had no sense of danger at this time, believing that a conductor would put his head out, see her and open the doors. Ten seconds elapsed before the train began to move.

Barton testified that she could not have removed the strap from her shoulder with a flick of the wrist. Barton stated that she would have had several factors working against her, including: her gloved hand, her awkward angle, the weight of her belongings hanging from her left shoulder, and the puffiness of her coat.

Barton testified that the train suddenly began to move northward while she was facing southward. Barton testified that she immediately stumbled and fell as the train pulled and she was pulled to the ground. Croghan testified that as the train started to move, she heard Barton saying, "No. Stop. No. Stop. No," in a very intense voice. Croghan

testified that she knew this was not, as she had thought, someone who had missed a train, but that Barton was attached to the train or that there was a violent crime occurring on the platform.

As the jogging path was roughly three feet lower than the train tracks, Croghan began to look under the wheels of the train. Croghan kept hearing Barton say, "Oh, God." Croghan described it as the most bloodcurdling thing she had ever heard. Croghan testified that she then saw a brown coat in a horizontal position between wheels, which then flashed underneath and disappeared. Croghan began running and screaming to nearby people, "Stop the train. She is being dragged. Call 9-1-1."

Barton testified that she was dragged in a half-sitting position, bumping along gravelly ground next to the wheels. Barton screamed at the top of her lungs. Barton thought she was probably going to die and had to choose between continuing to be dragged or trying to release herself from her straps. Barton stated that she thought either choice was likely to kill her; if she freed herself by pushing the bags off, she could flip herself under the wheels of the train.

Barton testified that she decided to try to free herself. According to Barton, this was difficult, due to her gloved hand and the force pulling on her and her belongings. Barton testified that the violin strap was the third down, so she got her hand under the straps as a bunch, gave a push to get them over the lump of her coat, and flipped away from the train.

Barton found herself in the gravelly area between the train tracks and the platform. Barton continued screaming because she wanted someone to hear her. Barton testified that she did not know so much pain could exist. Barton stated that all she could see "was like blood and [her] left leg was gone." Checking herself, Barton concluded that her internal organs and upper extremities were intact, at which point she thought she might live. Barton felt cold. Barton wanted to lie down and close her eyes, but thought that if she did, she would never awake. Barton decided she had to try to distract herself from thinking about her legs. At this point, people were coming toward her, one of whom was carrying something.

Brian McCarthy, another passenger on train No. 317, testified that he was walking to the vestibule of the train to exit at the next stop when he heard loud, bloodcurdling screams. McCarthy entered the vestibule from the south; a lady entering from the north said something about a young lady and a violin. McCarthy saw a violin at an angle, near the bottom of the steps.

McCarthy pushed a signal button in the vestibule until the train began to slow down. When the train stopped, McCarthy used a pen to

trigger the train doors to open, as he had seen conductors do. The violin tumbled out of the car onto the railroad ties. McCarthy looked behind the train, where he saw Barton in the gravelly area between the tracks and the platform.

McCarthy left the train, carrying the violin as he went toward Barton. McCarthy was the first person to reach Barton. McCarthy put the violin on the platform, approximately six to eight feet away. McCarthy could see that one of Barton's legs had been amputated, that the other leg was mutilated, and that blood was spurting out with her every heartbeat. McCarthy removed his belt and began to apply it as a tourniquet on her left leg.

McCarthy testified that Jim Tuck, one of his friends and neighbors, arrived shortly thereafter. Tuck's belt was applied as a tourniquet to Barton's other leg. According to McCarthy, Barton was alert and calm. McCarthy testified that Barton asked him something about the violin; McCarthy told her the violin was "right here." McCarthy also obtained Barton's name and her mother's telephone number. McCarthy and Tuck held onto the tourniquets until paramedics relieved them.

Barton testified that she kept talking while McCarthy was working, telling him her name, trying to remember her telephone number, and asking him to call her mother. Barton asked McCarthy what he was carrying, because she thought it might have been her violin. Barton stated that she kept repeating these sorts of statements, even after she was put into an ambulance, also asking about her purse and asking to have someone call her workplace, because she thought that if she stopped, she would have been "freaking out again." Barton recalled that her leg had been put next to her on the stretcher, like a jigsaw puzzle, or a broken Barbie doll.

Dr. Glen Reinhart, a board-certified orthopedic surgeon, testified that he was called to Evanston Hospital to treat Barton, who was already under anesthesia when he arrived. The lower part of Barton's left leg was attached only by a bridge of skin behind the knee. The front of Barton's right leg was missing most of the skin and soft tissue from mid-thigh to mid-leg. There was a large gap in the bone just below the right knee. The skin over the front half of Barton's right foot was torn away, exposing the bones of her toes.

Dr. Reinhart spent approximately eight hours operating on Barton that day. Barton's left leg below the knee was removed. Some of the removed tissue and bone was placed in the tissue bank for later reconstructive surgery. The toes on Barton's right foot had to be removed. Dr. Reinhart was deeply concerned as to whether Barton's right leg could be saved, in part because he knew that Barton ultimately was going to have an amputation of the left leg above the

knee, which would require a bigger prosthesis that would require more energy to use. There was no muscle remaining around Barton's right knee, the lower part of which was smashed into small pieces.

According to Dr. Reinhart, the surgeons could only close the wound on Barton's right thigh, as the skin on her shin was missing. Dr. Reinhart stated that open fractures such as this present a risk of infection. Dr. Reinhardt knew that he was going to have to remove unhealthy or contaminated skin every 24 to 48 hours for the next 10 days.

On January 23, 1995, Barton's left leg was amputated above the knee. Dr. Reinhart testified that this surgery left enough skin to cover the bone. During this surgery, doctors also filled the gap below Barton's right knee with beads made from bone cement containing antibiotic powder. Later in January, Dr. Gerald Harris removed a strip of muscle from the front of Barton's abdomen, transplanted it to her leg, and transplanted skin grafts from Barton's thigh to cover the muscle.

On March 14, 1995, Dr. Reinhart and his colleagues began to try to rebuild the bone in Barton's right leg, using the bone graft harvested during the initial surgery. In May 1995, Barton's leg was placed in an external device, similar to a cage, to support walking; Barton wore this device for $1^1/2$ years. The medical team had intended to add more bone graft in May 1995, but discovered Barton's bone was infected. Dr. Reinhart was concerned that if the infection was severe, Barton's right leg would have to be amputated. Infection also makes later surgeries, such as a total knee replacement, riskier. On October 23, 1995, Barton had more infected material removed.

The infection reoccurred in January 1996, requiring surgery to remove the infected material. Due to the recurring infection, Barton's leg was left open to heal naturally, aided by the periodic addition of bone chips and bone substitute. The wound required daily care, including the use of cleansing solutions and antibiotics. The wound was open in varying degrees until December 1996.

Dr. David Stulberg, an orthopedic surgeon and a board member of the Rehabilitation Institute of Chicago (RIC), helped found a program for performing artists at RIC in the 1980s. When Dr. Stulberg began seeing Barton in late 1996 or early 1997, Barton had no flexion in her right knee. Dr. Stulberg worked to improve the strength and motion in Barton's right knee through physical therapy and injections of synthetic joint lubricant.

Dr. Stulberg also recommended plastic surgery that could make her knee more pliable and prepare it for probable future procedures. Dr. Gregory Dumanian, a board-certified plastic surgeon, testified that Dr. Stulberg referred Barton to him for procedures (apparently in

1998) to expand the tissue on her right leg. The tissue expansion involved the surgical insertion of a balloon under the skin on Barton's right leg, which was periodically inflated with injections of a saline solution.

Dr. Alice G. Brandfonbrener, the founding director of the program for performing artists at RIC, examined Barton's left wrist when a problem arose as a result of having an intravenous feeding tube inserted there. This problem was resolved.[5] Dr. Brandfonbrener also testified that a violinist does not use just her arms and fingers, but also uses her back and leg muscles.

Barton testified that during the period of 1995-98, she had 25 surgeries, 223 medical appointments, 122 prosthetics appointments and 170 physical rehabilitation sessions. Her medical bills totaled $672,570.97.

Dr. Reinhart testified that, except for a few steps, Barton would always need the assistance of crutches or a walker to walk. Barton cannot climb or descend stairs. According to Dr. Reinhart, Barton may be able to eat and dress, but for things involving a lot of movement or lifting or carrying, she needs help or to stay in her wheelchair. Dr. Reinhart stated that as Barton matures, she will have less mobility; at some point, she will be in a wheelchair most of the time.

Dr. Stulberg testified that Barton would have to think about stump care issues on a daily basis, as her removable prosthesis depended on her skin for suction and various factors can cause her skin to change or break down. Dr. Brandfonbrener testified that Barton was having problems with skin breakdown. Barton testified that the skin breakdown was painful. Plaintiff's exhibit No. 176, a photograph of skin breakdown taken the day of Barton's testimony that she described as "one of those embarrassing ones [with] the raw open stuff right in the bikini area," was shown to the jury.

Dr. Stulberg testified that Barton would eventually need a knee replacement, to regain substantial motion and address pain likely to be associated with Barton's progressive arthritis. Dr. Stulberg opined that Barton would probably require further surgery on the stump of her right foot and possibly her right ankle. Dr. Stulberg further testified that Barton would need supervised physical therapy four days a week, along with a daily program, for the rest of her life. Dr. Stulberg testified that Barton will require assisted care in her activities of daily living for the rest of her life. Dr. Stulberg also testified that as Barton

---

[5]Barton testified that the intravenous tube had bruised the nerve of the carpal tunnel during the initial hospitalization. Barton regained her full playing ability in September 1995.

gets older, she will need emotional support, ideally professional support. Dr. Stulberg expected that Barton would benefit from future developments in prosthetics and in knee surgery techniques.

Dr. Gary Yarkony, a board-certified specialist in physical medicine and rehabilitation, prepared a future care plan for Barton at counsel's request that included attendant care for various daily activities from a certified nurse's assistant. Dr. Yarkony's plan also included a wheelchair-accessible van and periodic replacement prostheses and wheelchairs. Dr. Yarkony recommended that Barton travel by air in first class. Dr. Yarkony also testified regarding the special performance chair built for Barton by engineers at RIC.

Dr. Reinhart testified that Barton's right leg was forced to stick out from the wheelchair, increasing the risk that other people will run into it and potentially damage it. Barton cannot drive a normal vehicle. Traveling, especially by airplane, is difficult. Barton testified that she can only sit in one seat in coach class on an airplane—the bulkhead with the aisle to her right—to accommodate her right leg. She will board the airplane before most passengers, but this often results in others bumping into her right leg as they board.[6]

Barton testified that she has to travel with her companion. Barton cannot engage in her normal daily activities at a hotel, because she does not bring her wheelchair when she travels. Barton was not paying her companion and already felt beholden to him for carrying as many of her belongings as he does.[7] Barton met her companion in

---

[6]Although the defendants do not appeal the jury's award of economic damages, the jury heard evidence regarding Barton's career, her disability's impact on her choice of career, and the amount of travel involved in that career. Barton's childhood career goal was to become a soloist, but thought that as a backup position, she could become a concert master for a major orchestra. Barton testified that she now did not believe she could work seven days a week as a concert master.

Richard Corrado, Barton's manager, testified that it is practically impossible for Barton to play successive dates in different cities due to the travel time she needs. Corrado noted that older concert halls are not very accessible to the disabled; there had been occasions where Barton's traveling companion had to carry her up a flight of stairs at a venue. Barton testified that she went to every engagement she was supposed to have in 1997 and 1998, even when she was in horrible pain, because she needed the money to pay bills and to maintain a professional reputation.

[7]Barton's luggage includes her performance chair, packed in a large cube-shaped case, suitcases for Barton and her companion, the violin and her companion's brief case. Barton stated that with that luggage, the wheelchair would not fit in any vehicle a concert presenter might use to pick them up at an airport.

1995 through her church, initially striking up a friendship, but now living together. Barton stated that it was nice to have someone to hold her when she would experience "phantom pain" in her missing limb. The phantom pain can be anything from the feeling of an electrical shock, to itching, to the feeling that part of the limb is being slowly sliced or pierced by a million needles.

Barton also testified regarding the difficulties and limitations she has regarding any sexual activity with her companion. Barton testified that her injuries, surgical scars, and flab (as she is no longer as physically active as she was) make her resemble "one big Frankenstein's monster." Barton thought that her companion would eventually tire of her difficulties and limitations. Barton testified that even if she could find someone who was willing to be a stay-at-home husband, she did not think she would find someone who would want to take care of all of the domestic activities and care for her also. According to Barton, she is unable to care for herself to the degree that there was no possibility she could care for a child.

Gregory Larson, who was in charge of commuter service for the Union Pacific and formerly for CNW, testified that in the late 1950s or early 1960s, CNW adopted a fail-safe door light system. According to Larson, the train doors must close to create a connection that lights a green light signaling the engineer to proceed. Larson testified that one advantage of this system is that it does not depend on visibility; factors such as inclement weather or a curved track will not defeat the door light. Larson noted that a train may have up to 11 cars, each of which is 85 feet long. Another advantage is that if the door light goes out while the train is moving, the engineer can contact the conductors to investigate whether a door has been opened.

If the door light system malfunctions, a backup procedure known as the "second look system" is used. According to Larson, under the "second look system," the conductor charged with closing the train doors closes all of the doors other than those at his or her location. That conductor then steps off or leans out of the train and looks up and down the length of the train. If the conductor does not see any passenger movement, the conductor closes his or her own door and uses a buzzer to signal the engineer to proceed.

Larson also testified that the train doors are edged with two inches of rubber. According to Larson, this creates a four-inch distance that allows passengers who stick a hand, arm, leg, foot or package into closing doors to remove them. Larson further testified that the train at issue had an event recorder that showed the train had stopped in Winnetka for 27 or 29 seconds.

John Deutch, a conductor for the Union Pacific Railroad, worked on the CNW train at issue on January 16, 1995. According to Deutch, the train at issue consisted of a locomotive and four cars, three of which were used for passengers. The front car was being used for mail delivery.

Deutch testified that his job that day was to deliver company mail to the ticket agents up and down the line. Deutch did not look up and down the span of the train when reboarding the train because it was not his job. Deutch stated that the conductors assigned to the passenger cars, Mark Giocamara and Shawn White, also went onto the platform in Winnetka.

Giocamara testified that he had been on the second car from the locomotive. When Giocamara was satisfied that the passengers had safely deboarded, he and White signaled each other to proceed. Giocamara testified that, as a matter of practice, he would look up and down the train; if he saw anyone other than White on the platform, he would give the signal to stop. Otherwise, Giocamara would reboard the train. According to Giocamara, White had the responsibility for closing the train's doors.

White testified that he was assigned to the trailing passenger car on the day at issue; he and Giocamara would both work the middle passenger car. On January 16, 1995, the weather was a little cloudy; traffic was light. While on the Winnetka platform, White saw Deutch reboard the train but did not remember whether Deutch closed the door on the mail car.

White testified that one or two seconds would pass between the time the conductors checked for passenger movement and the time it takes him to push the buttons that close the doors. Another one or two seconds might pass before the doors begin to close. According to White, it could take three or four seconds for the doors to close entirely.

White testified that closing all of the doors would activate the door light signal for Perry Goosie, the train's engineer. White closed the doors on the trailing car, then the doors on Giocamara's car, then the doors in the middle car where White was located. White testified that he did not hear any voice outside the train after closing the doors. White believed that if he had looked up and down the exterior of the train before closing his doors, he would have seen someone exiting.

White further testified that when the train stopped, he used the intercom to contact Goosie, who told him buzzers were going off and that he had lost air pressure in the last car. White rushed to the last car, where he saw that the doors had been opened. Passengers told him they had heard screaming. White left the train and headed toward Barton, who was being attended by a passenger.

Goosie testified that there was a side mirror on the locomotive which he used to watch passengers and conductors on the platform, but it was not his primary responsibility to look in the mirror before leaving the station.

Barton introduced testimony from 12 witnesses and the files of three claimants regarding prior substantially similar occurrences (SSOs) reported to CNW or Metra between April 1990 and July 1994, in which passengers had limbs and clothing become stuck in the closing doors of trains. In one case, a child became separated from its mother. Passengers were dragged in three of these incidents. Though some of the passengers were injured in these incidents, none suffered injuries of the magnitude Barton suffered, as the people involved were able to free themselves. Defendants elicited testimony that the train doors were open when the train began to move in some of these cases.

Carl Biron, the former transportation superintendent for CNW, was responsible for the safe and on-time operation of three suburban train lines. Biron testified that prior to January 1995, he was not familiar with the details of any dragging incident. Biron admitted that he had known about an incident introduced into evidence involving Josephine Rose. Robert Szczecinski, who was CNW's special claims counsel and supervised CNW's claims operations for Illinois and Wisconsin from 1990-95, testified that he handled the Josephine Rose case. According to Szczecinski, in May 1990, Rose was dragged by a CNW train after her coat became caught in the train doors. Szczecinski testified that this was a serious event. Szczecinski also testified without objection that it was part of the train crew's responsibility to use the highest degree of care consistent with the mode of conveyance and the practical operation of a common carrier by rail to prevent such incidents.

Biron was also questioned about an incident involving Ted Mizuno. Biron replied that he believed that name came up in his deposition; Biron's deposition testimony was that he did not recall the details, but if it happened, he was sure he knew about it. Mizuno testified that in February 1992, his right arm was trapped up to the shoulder when the doors closed as he was deboarding a CNW train. The train began to leave the station. Mizuno kept up with the train and was able to free his arm after approximately 30 or 40 feet.

Biron testified that he recalled an incident that took place in Norwood Park. Anna Mae Gibson testified that on July 1, 1993, she boarded a CNW train at Norwood Park, along with Rita Pryska, who lived in her building. Gibson took an exterior handle as Pryska boarded the train.

Gibson had placed her right foot on the train stairs when the train

began to move. Gibson stated that she was unable to get her left foot up into the train. Pryska grabbed Gibson's left hand. Gibson stated that she then fell between the platform and the wheels. Gibson testified that she was on her back, being dragged underneath the train. Gibson testified that she kept thinking, "Oh, please, God, don't let her let go of my arm," because Gibson thought that had Pryska let go, she would not have an arm. According to Gibson, she was dragged approximately 100 feet before she was pulled into the train by others. The back of Gibson's clothes were torn. Gibson testified that after the train came to a stop, she asked the conductors whether they could retrieve her shoes. Gibson testified that the doors were open during this incident; CNW claims investigator Mary Hart testified that there was a problem with the door light in that case. CNW's final report on this incident states in part that the cause of the accident was a "[c]onductor using buzzer because of doors on Car #7860." Defendants' brief cites CNW's final report in stating that the second look system was in use at the time of the Gibson incident, but defendants' record citation does not support that statement.

Biron further testified that CNW was responsible for developing its own rules and regulations. Biron testified that he had been involved in decisions to change safety rules prior to January 1995.

Larson testified that a change in CNW's rules was not taken lightly and would generally involve input from a number of different departments. According to Larson, CNW had an "Operating Safety Steering Committee" (OSSC), which consisted of "the senior management of the operating department, vice president of operations, vice president of transportation, engineering, mechanical, the safety department, the rules department, the claims department, [and] the legal department." Larson testified that the OSSC would gather all of their collective information to determine whether a change was warranted. Larson did not believe the SSOs warranted a change in system.

Mark VanCleave, the former assistant vice president of CNW's commuter operations department, testified that others, including the claims department, had jobs that involved analyzing the frequency and severity of incidents that occurred in the operation of the railroad. According to VanCleave, he would be notified only when the severity of an incident warranted it or if there appeared to be an unsafe trend. VanCleave testified that "[s]everity means where someone is physically harmed to a high degree." VanCleave testified that the prior incidents never came to his attention through the railroad's safety group, transportation group, or through his subordinates. VanCleave stated his belief that the people below him handled the SSOs properly.

Dennis Mogan, Metra's director of safety and rules, testified that

Metra owns the cars and engines operated by its purchase-of-service carriers. Mogan also testified that lines operated by Metra used the second look system. When Metra took over the operation of the Illinois Central line (n/k/a the Metra Electric line), Metra required the second look system in addition to the existing door light system. Mogan testified that Metra and CNW had a cooperative effort on safety matters. Mogan stated that if he had been made aware of the SSOs, he would have conducted a safety audit. Mogan stated that a safety audit would have been conducted upon the first such complaint, regardless of whether the person was injured.

Richard Tidwell, Metra's deputy executive director, testified that Metra had the power to make suggestions and recommendations to CNW. When asked whether using the second look system together with the door light system would be safer than using only one system, Tidwell testified that "intuitively, it would sound that way, but I don't have anything to convince me of that."

Economist Charles Linke, Ph.D., testified regarding the net worth of CNW as of December 3, 1994, and the net worth of the Union Pacific Railroad as of December 31, 1997.

James Finan, a former railroad accident investigator for the National Transportation Safety Board (NTSB), testified for the plaintiff. Finan stated that his prior investigations had not involved door closings. In this case, Finan reviewed the passenger safety rules of the Long Island Railroad, CSX, and the MBT Boston, as well as those of CNW and Metra. Finan spoke to friends who worked for New Jersey Transit and Metro North about the second look system. Finan also examined the train at issue shortly after the accident, along with representatives of CNW. The jury was shown a videotape of the examination of the door light system on the train car at issue. According to Finan, the door light could be activated when the doors on the car at issue were open 9 to 12 inches. Finan opined that this was a cause of the 14 prior incidents introduced into evidence. Finan acknowledged that the time difference resulting from the 9- to 12-inch gap would be only a fraction of a second if someone was not stuck in the doors.

Finan testified that there was no federal, state or industry rule or regulation mandating the second look system. Finan testified that, relative to the custom and practice of passenger railway systems, the second look system was the most prevalent. Finan also stated that the Metra system was his preference, but admitted that other commuter rail systems may have other preferences.

Finan opined that Metra should have known the difference between its rules and CNW's rules, stating that it was like a parent not knowing what the child is doing. Finan also opined that "they have

that degree of responsibility to rec—have the ability—have the hierarchy in place to recognize a problem," but it was not working. Finan further opined that CNW's failure to incorporate the second look system into its door-closing procedure was a cause of the accident. Finan opined that Metra failed to exercise the highest degree of care for Barton's safety by not recommending that CNW incorporate the second look system, stating that Metra "ha[s] a relationship to oversee their contractors, to make sure that their contractors are performing in a safe and efficient manner" and was "remiss in their duties as a parent company."

Gary Wolf, president of Rail Sciences, Incorporated, a consulting firm specializing in railway operational matters, testified for the defense. After reviewing 27 other commuter rail agencies, Wolf concluded that each had different door-operating systems. Wolf opined that both Metra and CNW had systems that met the applicable standard of care for a common carrier by rail and that the second look system was not required.

Wolf testified that there were no major similarities among the SSOs introduced into evidence. Wolf stated that there was no pattern in their timing and that none involved a significant injury. Wolf further stated that, based on statistics already introduced into evidence, 14 or 15 incidents out of approximately 224 million ingresses and egresses over the same five-year period meant that there was a six-millionths of 1% chance of such an incident, which was statistically insignificant.

Wolf was cross-examined regarding the procedures of the railroads he had reviewed. Wolf testified that there were five railroads that had door lights, but no second look system. Wolf also testified that "it is safe to say, in all of these matters, there is some human side of it or some procedure."[8] Wolf testified that the Calgary Transit System, which uses both a door light and a second look system, experienced a fatal dragging incident.

Jerry Purswell, a safety and ergonomics consultant, testified that testing of the train at issue showed that it took between 4.6 to 8

---

[8]Wolf admitted that Greater Ontario Transit required the crew member controlling the doors to observe the side of the train until it had left the platform, but stated this rule was due to be superceded. Greater Cleveland is supposed to require the operator to stick his head out the window during boarding and deboarding. Santa Clara required the operator to look out at a mirror after closing the doors to determine whether it is clear. The Tri-County Commuter Rail Authority had a rule stating that the crew should notice whether persons are hanging onto the side of the cars. Wolf admitted that San Diego Trolley had a second look system.

seconds to travel five feet from a stopped position. Purswell also conducted tests designed to replicate someone being caught in a strap in the manner Barton described, determining that it took approximately 1½ to 2 seconds to free oneself from a strap. Purswell opined that Barton should not have had any difficulty freeing herself from the strap as the train began to move, had she chosen to do so.

Purswell admitted that he formed his opinions prior to learning of Croghan's testimony. Purswell also admitted that the coat used in his testing had less shoulder padding and was made of more slippery material than the coat used in plaintiff's demonstration to the jury, which he had not seen before. Purswell added that the violin case strap he used was shorter than the actual strap.

Following jury instructions and closing arguments, the jury deliberated and returned a verdict in favor of Barton on March 1, 1999, in the following amounts: $9 million for disability; $8 million for disfigurement; $8 million for pain and suffering; $3 million in future pain and suffering; $20,250 in lost wages; $104,370 in future lost wages; $672,570.97 in medical expenses; and $1,293,018 for future medical expenses. The jury allocated 62.5% of the fault to CNW, 33% of the fault to Metra, and 4.5% of the fault to Barton. After the 4.5% reduction, the total verdict was $28,736,149.57. The jury also awarded $900,000 in punitive damages, which were reduced 4.5% to $859,500. On March 3, 1999, the trial court entered a judgment on the verdict.

On March 10, 1999, plaintiff filed an emergency motion seeking to have the trial court quash subpoenas believed to have been issued for the deposition of jurors. On March 17, 1999, defendants' response alleged that a juror referred to as Ms. A gave false information on her juror information form and in response to questioning during *voir dire* as to whether she had ever been a party to any lawsuit, whether she was a party to any case now pending in the circuit court of Cook County, and whether she had ever been involved in an accident where people were injured.

As an exhibit to their response, defendants attached a copy of the *voir dire* transcript. Defendants also attached a copy of a complaint filed in the circuit court on December 10, 1998, naming Ms. A as the plaintiff. This complaint alleged that Ms. A injured her right index finger when she attempted to enter a Kohl's Department Store while a customer was attempting to exit the store through the same door, due to the alleged negligence of the store in controlling the door or the negligent failure to inspect or mark the door. Defendants also attached a record from the Illinois Industrial Commission showing that Ms. A filed a worker's compensation claim in December 1986. Defendants sought to depose Ms. A but were not seeking to depose the jury's foreman at that time.

The trial court held a hearing and decided that it would question Ms. A and the jury's foreman. The trial court allowed the parties to submit questions to be asked of the witnesses.

On March 24, 1999, the trial court conducted a hearing in which the trial judge questioned Ms. A and the jury's foreman. The trial court stated that it was not going to allow any of the questions submitted by the parties, but then stated that it might use parts of both parties' questions. When the trial court questioned Ms. A regarding her failure to state during *voir dire* that she was a party to a pending lawsuit, Ms. A responded that she had not remembered the suit at that time and did not remember it until it was raised in a telephone call from a reporter. After a colloquy with the parties' attorneys, the trial judge asked Ms. A about the answers on her juror information form. Ms. A responded she did not remember the lawsuit because in 1998, her company had gone bankrupt, her daughter was expecting a baby, and her husband had been diagnosed with cancer, which required her to take him places for care and to be trained to administer shots to him. Ms. A's husband died in October 1998. Ms. A testified that she had asked her daughter to handle the filing of the lawsuit. After a further colloquy with the attorneys, the trial court asked Ms. A when she had last spoken to her counsel about that lawsuit; Ms. A responded that it would have been before the case was filed. The trial court declined to ask Ms. A any further questions.

The trial court then questioned the jury's foreman, who testified that the jury deliberated for 17 hours and that all of the jurors participated. The foreman opined that, had Ms. A not been present, the other 11 jurors would have reached the same result. The foreman also opined that Ms. A did not have a greater influence than any other juror. The foreman thought the jury followed the jury instructions. The trial court then ended the questioning, stating that the court was "not interested in what exactly each juror said," adding that "as long as it was a unanimous vote, that does it."

The trial court also denied defendants leave to subpoena other jurors and members of the media. On April 29, 1999, the trial court scheduled the filing and hearing of posttrial motions.[9]

On May 17, 1999, defendants filed their posttrial motion, which included issues relating to Ms. A's jury service. Defendants attached an affidavit by Summer Heil, an associate with one of the defense firms in this case. The affidavit states that on March 29, 1999, Heil

---

[9]Defendants' petition for an original writ of *mandamus* or a supervisory order from the Illinois Supreme Court, seeking depositions of the jurors, was denied on May 7, 1999.

contacted three jurors to discuss statements regarding Ms. A's jury service that were attributed to jurors in articles published by the Chicago Tribune and the Chicago Sun-Times. Two of the jurors declined to speak to Heil. The third, Martha Mueller, told Heil that she agreed with statements attributed to juror Charlene Wright that Ms. A "was very one-sided" and wanted "more money for Rachel." According to Heil, Mueller stated that Ms. A was "strong-willed," "knew her mind," "stated her mind," and was not easily swayed. Mueller declined to execute a sworn affidavit on the matter.

On June 14, 1999, following a hearing on the matter, the trial court denied defendants' posttrial motion. Defendants filed a timely notice of appeal to this court.

## I

■ Defendants first argue that they are entitled to a new trial, claiming that they were denied due process of law because they were not tried before a properly constituted jury. The standard of review is whether the trial court abused its discretion in granting or denying the motion for a new trial. *Pekelder v. Edgewater Automotive Co.*, 68 Ill. 2d 136, 138, 368 N.E.2d 900, 901 (1977). An abuse of discretion occurs when the judge's ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view. *People v. Illgen*, 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519 (1991). An application of impermissible legal criteria also justifies reversal. *Boatmen's National Bank of Belleville v. Martin*, 155 Ill. 2d 305, 314, 614 N.E.2d 1194, 1199 (1993).

■ The Illinois Constitution guarantees the right to trial by a jury of 12 members. See *Hartgraves v. Don Cartage Co.*, 63 Ill. 2d 425, 427, 348 N.E.2d 457, 458 (1976). Plaintiffs and defendants alike have the right to an impartial jury. *Smithers v. Henriquez*, 368 Ill. 588, 598, 15 N.E.2d 499, 504 (1938). *Voir dire* protects the right to an impartial jury by exposing possible biases of potential jurors. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554, 78 L. Ed. 2d 663, 670, 104 S. Ct. 845, 849 (1984). A new trial is required where the movant establishes that: (1) a juror answered falsely on *voir dire*; and (2) prejudice resulted therefrom. *Pekelder*, 68 Ill. 2d at 139, 368 N.E.2d at 901.

As to the first prong of the *Pekelder* test, "[w]hether intentional or not," Ms. A falsely answered questions on her form and during *voir dire*. *Pekelder*, 68 Ill. 2d at 140-41, 368 N.E.2d at 902. Plaintiff argues that intentional dishonesty is required, based on the court's statement in *People v. Olinger*, 176 Ill. 2d 326, 354-55, 680 N.E.2d 321, 335 (1997), that "defendant [had] failed to demonstrate that the juror lied

during her *voir dire* examination." However, the *Olinger* court so stated because the defendant had *claimed* the juror lied; the court also noted that the record did not "demonstrate any *falsity* in the juror's *voir dire* testimony." (Emphasis added.) *Olinger*, 176 Ill. 2d at 354, 680 N.E.2d at 335. Plaintiff also cites *McDonough*, in which the Supreme Court stated that to obtain a new trial, a party must demonstrate that "a juror failed to answer honestly a material question on *voir dire*." *McDonough*, 464 U.S. at 556, 78 L. Ed. 2d at 671, 104 S. Ct. at 850. However, five Justices in *McDonough* also opined that dishonesty is relevant, but not required in all cases. See *McDonough*, 464 U.S. at 556-57, 78 L. Ed. 2d at 672, 104 S. Ct. at 850 (Blackmun, J., concurring, joined by Stevens and O'Connor, JJ.); 464 U.S. at 557-59, 78 L. Ed. 2d at 672-74, 104 S. Ct. at 850-52 (Brennan, J., concurring in the judgment, joined by Marshall, J.).

As for the second prong of the *Pekelder* test, defendants claim they have shown prejudice *per se* because having pending litigation in the same court is sufficient cause for challenging a potential juror under the Jury Act (705 ILCS 305/14 (West 1998)). The *Pekelder* court was not required to address that argument. *Pekelder*, 68 Ill. 2d at 141, 368 N.E.2d at 902. However, the *Pekelder* court noted that this court had rejected similar claims. *Pekelder*, 68 Ill. 2d at 140, 368 N.E.2d at 902, discussing *Kuzminski v. Waser*, 314 Ill. App. 438, 41 N.E.2d 1008 (1942), and *Maher v. New York, Chicago & St. Louis R.R. Co.*, 290 Ill. App. 267, 8 N.E.2d 512 (1937).

More recently, in *Diaz v. Kelley*, 275 Ill. App. 3d 1058, 657 N.E.2d 657 (1995), a juror stated that he had never been a party to a lawsuit, but was a defendant in two collection actions for medical bills. This court held that the plaintiff had failed to show actual prejudice in favor of the defendant medical provider, regardless of whether the litigation was pending. *Diaz*, 275 Ill. App. 3d at 1065, 657 N.E.2d at 663. In *Mathieu v. Venture Stores, Inc.*, 144 Ill. App. 3d 783, 797, 494 N.E.2d 806, 814 (1986), a juror told the court that, after being sworn, he had been served with a summons as a defendant in a civil suit; this court refused to reverse based on section 14 of the Jury Act, absent a showing of prejudice. It is true that in *Mathieu*, the statutory condition arose after *voir dire*, but that fact should not matter if the condition created bias *per se*.

Defendants note that *McDonough* held that a new trial is warranted when "a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556, 78 L. Ed. 2d at 671, 104 S. Ct. at 850. However, when read in context, that condition is linked to a finding of dishonesty. That a true response on *voir dire* would have been a valid basis for a challenge for cause may be insufficient to warrant a new trial in cases of mistake or forgetfulness.

In this case, the trial court ruled that Ms. A's posttrial testimony was truthful. Defendants argue that this ruling was an abuse of discretion because Ms. A persisted in giving false answers. The record shows that Ms. A did not deny past or pending litigation when questioned after the trial. Defendants also argue that Ms. A gave "facile and inconsistent post-trial excuses." The transcript shows that Ms. A did not give facile answers; her grammar was consistent with plaintiff's counsel's description of Ms. A having an immigrant background. Nor were Ms. A's answers inconsistent, when read in context. Defendants further argue that "[m]edia accounts make plain that Ms. A has demonstrated an over-active penchant for notoriety." However, defendants have not identified evidence showing that Ms. A sought out the media, rather than *vice versa*. Thus, defendants have failed to show that the trial court's finding was arbitrary, fanciful, or unreasonable.

■ Nevertheless, even without a finding of dishonesty, there are cases where a presumption of prejudice may arise. See *People v. Porter*, 111 Ill. 2d 386, 404, 489 N.E.2d 1329, 1336 (1986); see *McDonough*, 464 U.S. at 556-57, 78 L. Ed. 2d at 672, 104 S. Ct. at 850 (Blackmun, J., concurring, joined by Stevens and O'Connor, JJ.); 464 U.S. at 557-59, 78 L. Ed. 2d at 672-74, 104 S. Ct. at 850-52 (Brennan, J., concurring in the judgment, joined by Marshall, J.). The test is whether the probability of prejudice is such that due process would be deemed inherently lacking. See *People v. Holmes*, 69 Ill. 2d 507, 514, 372 N.E.2d 656, 559 (1978).

Defendants cite federal cases presuming bias where the prospective juror has been in a similar situation or has pending similar litigation. See, *e.g.*, *Hunley v. Godinez*, 975 F.2d 316, 319 (7th Cir. 1992); *Consolidated Gas & Equipment Co. of America v. Carver*, 257 F.2d 111, 115-16 (10th Cir. 1958). However, Illinois courts are generally not bound to follow federal case law. *E.g.*, *People v. Eyler*, 133 Ill. 2d 173, 225, 549 N.E.2d 268, 291 (1989). Indeed, the *Carver* court noted that *Kuzminski* and *Maher* reached a conclusion contrary to its position. *Carver*, 257 F.2d at 115.

In sum, this court has never held that circumstances such as those presented here create a presumption of prejudice. Instead, this court has consistently ruled that a party seeking relief based on a juror's unintentional failure to disclose prior or pending litigation must show actual prejudice.

Defendants argue that the trial court precluded them from showing actual prejudice. An opportunity to show actual prejudice is required by due process concerns, but there are few Illinois cases addressing the proper procedures for a hearing on juror bias. It is clear that the burden was on the defendants to support their allegations of

bias; a mere suspicion of bias is not sufficient. *Porter*, 111 Ill. 2d at 404, 489 N.E.2d at 1336.

■ Defendants chiefly rely on cases involving juror exposure to extraneous information. A juror may testify as to whether such information was brought to the jury's attention without threatening the jury secrecy courts generally seek to protect. *Holmes*, 69 Ill. 2d at 516, 372 N.E.2d at 660. A juror's statement that he or she was not influenced is not conclusive. *People v. Hryciuk*, 5 Ill. 2d 176, 184, 125 N.E.2d 61, 65 (1954). The inquiry may extend to asking jurors whether they were exposed to extraneous information by others and, if so, what information was exchanged. *Van Hattem v. K mart Corp.*, 308 Ill. App. 3d 121, 130-31, 719 N.E.2d 212, 220-21 (1999).

Defendants also cite federal cases, such as *United States v. Boney*, 68 F.3d 497 (D.C. Cir. 1995), which held that the district court held an inadequate hearing after a juror failed to disclose his prior felony convictions. As is the case in Illinois, the *Boney* court noted that review of such inquiries tends to be case-specific. See *Boney*, 68 F.3d at 501. In a given case, examination by counsel may be necessary to probe for a juror's concealed bias. See *Boney*, 68 F.3d at 502. The *Boney* court ruled that the juror should have been asked more probing questions, such as whether he disclosed his prior felony convictions to the jury, information he learned from his prosecution and sentencing, or any attitudes he acquired thereby. See *Boney*, 68 F.3d at 500, 502-03. The *Boney* court also found error in the trial court's refusal to allow counsel to question the juror, subject to the authority of the trial judge to hear objections. *Boney*, 68 F.3d at 500, 503.

In this case, the testimony permitted the trial court to infer that Ms. A had not referred to her pending litigation or finger injury during the jury deliberations. The Heil affidavit does not suggest otherwise. Moreover, unlike *Boney*, the trial court questioned the suspect juror and the foreman.

■ The fact that the court's inquiry could have been more searching does not require a new trial. See *Porter*, 111 Ill. 2d at 403, 489 N.E.2d at 1336. Defendants note that they were precluded from asking Ms. A and the jury foreman whether they agreed that Ms. A was very one-sided in the deliberations and had wanted more money for the plaintiff. However, even assuming *arguendo* that the Heil affidavit's contents were true, the question would remain as to whether Ms. A's positions were subconsciously influenced by her alleged finger injury or were the product of the evidence presented at trial. See *Porter*, 111 Ill. 2d at 405, 489 N.E.2d at 1337. Defendants raise no specific objections to the court's refusal to ask the other questions they submitted,

none of which seem designed to uncover a subconscious bias.[10] The trial court was not required to permit counsel to ask questions that were irrelevant to this issue. Nor was the court required to act as defense counsel by asking the questions defendants could have properly requested. Thus, the trial court, which was in a position to observe the witnesses and their demeanor, could reasonably conclude that defendants failed to carry their burden of showing a probability, rather than a suspicion, of subconscious bias.

Defendants argue that the trial court's analysis of prejudice was solely based on whether the jury would have reached the same verdict without Ms. A, which they claim was error under *Van Hattem* and *Hryciuk*, which involved alleged juror exposure to extraneous information. As noted above, the trial court could infer that Ms. A did not disclose such information. Moreover, the transcript shows that the trial court also used the foreman's testimony as a check against the court's assessment of Ms. A's testimony, the truthfulness of which was clearly relevant to the issue of bias.

In sum, defendants have failed to show that the trial court's refusal to grant a new trial based on Ms. A's failure to disclose prior or pending litigation was an abuse of discretion.

## II

■ Defendants next argue that the trial court erred in not granting them judgment notwithstanding the verdict (judgment *n.o.v.*) on plaintiff's claim of punitive damages to the jury. A motion for judgment *n.o.v.* should be entered only when all of the evidence, viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 511, 229 N.E.2d 504, 513-14 (1967). Defendants also argue that the jury instruction defining willful and wanton conduct was improper.

■ "It has long been established in this State that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others ***." *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186, 384 N.E.2d 353, 359 (1978). As there was no evidence of a deliberate intention to harm Barton, Illinois Pattern Jury

---

[10]A review of those questions shows that defendants sought to discover: whether jurors had retained counsel and the terms of any such agreement; whether jurors had spoken to Barton or her attorneys; who, if anyone, jurors contacted after receiving a subpoena from defendants; and what positions Ms. A took during the jury deliberations on various issues.

Instructions, Civil, No. 14.01 (3d ed. 1993) (hereinafter IPI Civil 3d) was given to the jury in the following form:

"When I use the expression 'willful and wanton conduct' I mean a course of action which shows an utter indifference to or conscious disregard for a person's own safety."

See IPI Civil 3d No. 14.01, Notes on Use at 14-3. Defendants argue that *Ziarko v. Soo Line R.R. Co.*, 161 Ill. 2d 267, 641 N.E.2d 402 (1994), "stands for the proposition that *punitive damages cannot be recovered upon a jury finding rendered in response to the abbreviated form of IPI 14.01*," but only for intentional willful and wanton conduct. (Emphasis added.)

■ Defendants concede in their brief that "*Ziarko* did not involve a question of punitive damages." Defendants fail to note that *Ziarko* produced only a plurality opinion. *Poole v. City of Rolling Meadows*, 167 Ill. 2d 41, 48, 656 N.E.2d 768, 771 (1995). While the *Poole* court adhered to the ultimate holding in *Ziarko*, drawing a distinction between intentional and reckless willful and wanton misconduct for the purposes of analyzing principles of contribution and comparative fault, it did not refer to the language in the *Ziarko* plurality opinion that defendants read as suggesting that punitive damages can only be awarded in cases of intentional willful and wanton conduct. See *Poole*, 167 Ill. 2d at 48, 656 N.E.2d at 771. Our supreme court has continued to state that punitive damages may be awarded for gross negligence showing a wanton disregard for the rights of others. *Cirrincione v. Johnson*, 184 Ill. 2d 109, 115-16, 703 N.E.2d 67, 70 (1998). Thus, the jury instruction was properly given.

■ The question remains as to whether the trial court should have granted judgment *n.o.v.* Whether punitive damages can be awarded for a particular cause of action is a matter of law, but the question of whether a defendant's conduct was sufficiently willful or wanton to justify imposing punitive damages is generally for the jury to decide. *Cirrincione*, 184 Ill. 2d at 116, 703 N.E.2d at 70.

■ Evidence of SSOs is admissible to show a conscious disregard for the safety of others. *Loitz v. Remington Arms Co.*, 177 Ill. App. 3d 1034, 1063, 532 N.E.2d 1091, 1109 (1988), *rev'd on other grounds*, 138 Ill. 2d 404, 563 N.E.2d 397 (1990). Defendants rely on the supreme court's decision in *Loitz*, which discussed the probative value of SSOs as notice to a defendant in assessing the propriety of an award of punitive damages. The *Loitz* court considered the following factors: the ratio of prior SSOs to the total number of products sold and the number of products in use; the ratio of SSOs to the frequency of the product's use; and the product's inherent dangers. See *Loitz*, 138 Ill. 2d at 419-20, 563 N.E.2d at 404. The *Loitz* court ruled that notice of

94 shotgun-barrel explosions similar to the one that injured the plaintiff was insufficient to notify Remington of an alleged defect, given that Remington made 3 million such barrels and the estimated number of times such shotguns would have been fired. See *Loitz*, 138 Ill. 2d at 420, 563 N.E.2d at 404; see also *Kopczick v. Hobart Corp.*, 308 Ill. App. 3d 967, 721 N.E.2d 769 (1999) (hand injuries sustained in using a meat-cutting saw); *Dunn v. Illinois Central Gulf R.R. Co.*, 215 Ill. App. 3d 190, 574 N.E.2d 902 (1991) (railroad's failure to install flashing lights or crossing gates at a crossing).

██ Defendants believe that the supreme court's decision in *Loitz* applies here, where the evidence shows that the 14 or 15 SSOs out of approximately 224 million ingresses and egresses were statistically insignificant. Defendants stress that this case is the first to result in a serious injury.

*Loitz* and its progeny involve inherently dangerous products or situations. As the supreme court noted, "[g]uns are inherently dangerous instrumentalities, and the mere occurrence of other explosions does not, without more, establish outrageous misconduct or some other basis sufficient to warrant the imposition of punitive damages." *Loitz*, 138 Ill. 2d at 419, 563 N.E.2d at 404. Even *Dunn* involved a railroad crossing, not a passenger attempting to deboard a train stopped at a station. Railroad crossings are inherently dangerous (*Hunter v. Chicago & North Western Transportation Co.*, 200 Ill. App. 3d 458, 466, 558 N.E.2d 216, 221 (1990)), but defendants cite no authority stating that deboarding a commuter train stopped at a station is inherently dangerous. Thus, the trial court did not err in admitting the evidence of SSOs to show a conscious disregard for the safety of others.

Defendants also note that in *Loitz*, Remington knew of the SSOs, but claimed that they were all caused by the use of high-pressure shells; the plaintiff did not present any evidence that cast doubt on Remington's good faith in investigating the SSOs. *Loitz*, 138 Ill. 2d at 426-27, 563 N.E.2d at 407. Defendants claim that this case is similar. However, defendants also suggest that four of the SSOs here were cases where the door light was malfunctioning. Defendants state that the second look system was used in the incident involving Gibson, but their assertion is not supported by their citation to the record. Moreover, defendants have not identified evidence in the record that CNW's agents concluded that the SSOs were solely caused by factors other than reliance on the door light system.

Defendants further claim in passing that James Finan's testimony that "information was stuck in the pipeline" shows an inadvertent failure to correct a problem, not willful and wanton conduct.

Defendants' unstated premise is that CNW is not liable for punitive damages unless officials as senior as Larson and VanCleave were aware of SSOs. However, defendants have failed to cite authority in support of such a proposition, thus waiving the issue on appeal. 177 Ill. 2d R. 341(e)(7).[11]

In this case, Biron, who was responsible for the safe operation of CNW's suburban train lines and had been involved in CNW's rule-making process, testified that he knew of at least three of the SSOs. Indeed, Biron did not deny that his department had "actual or paperwork knowledge" of all of them. Szczecinski, who supervised CNW's claims operations for Illinois and Wisconsin, personally handled one of the SSOs, which he described as a serious event of the sort CNW has a duty to prevent. Yet VanCleave testified that he believed that the people below him handled the SSOs properly and Larson stated that he did not believe the SSOs warranted a rule change.

Viewing the evidence in the light most favorable to the plaintiff, CNW knew that the door light system was not fail-safe. Responsible CNW officials knew of the SSOs and did nothing, even though adding the second look system would have cost nothing. Other high-level CNW officials approved of their subordinates' failure to notify them of a problem. CNW's officials approved of a system defining the severity of the SSOs in terms of the injuries actually suffered, rather than the injuries that were reasonably foreseeable from such incidents. Viewing the evidence in the light most favorable to the plaintiff, there was evidence of a conscious disregard of passenger safety.

In sum, defendants have failed to show that the trial court erred in respect to the jury instruction or in submitting the claim to the jury. Defendants are not entitled to judgment *n.o.v.*

### III

■ Defendants also argue that Metra owed Barton no duty of care because Metra was not a common carrier as to Barton. Whether

---

[11]Notwithstanding defendants' waiver, we note that punitive damages may be awarded against a corporation based on vicarious liability where the principal authorized the doing and the manner of the act or omission; the agent was unfit and the principal was reckless in employing the agent; the agent was employed in a managerial capacity and was acting within the scope of employment; or the principal or a managerial agent thereof ratified or approved of the act. See, *e.g.*, *Mattyasovszky v. West Towns Bus Co.*, 61 Ill. 2d 31, 36-37, 330 N.E.2d 509, 512 (1975). The record shows that the trial court refused defendants' instruction listing these circumstances. However, defendants have not appealed that ruling, thus waiving that objection as well. Even so, the evidence adduced at trial meets the *Mattyasovszky* criteria.

the undisputed facts establish the relationship of common carrier and passenger is a question of law for the court to determine. *Burns v. Regional Transportation Authority*, 112 Ill. App. 3d 464, 469, 445 N.E.2d 348, 352 (1982), *rev'd on other grounds, Stack v. Regional Transportation Authority*, 101 Ill. 2d 284, 461 N.E.2d 969 (1984). In this case, Mogan testified that Metra owned the train cars and engines operated by its purchase-of-service providers. Metra admitted in its pleadings that it owned the train at issue. Metra admitted in its fourth amended answer that it is a common carrier, but now argues that it was not a common carrier *as to Barton* because CNW was operating Metra's train.

■ Illinois law has rejected similar arguments for over a century. *E.g.*, *Wabash, St. Louis & Pacific Ry. Co. v. Peyton*, 106 Ill. 534 (1883); see also *Cobb v. Marshall Field & Co.*, 22 Ill. App. 2d 143, 153-54, 159 N.E.2d 520, 524-25 (1959) (elevator owner is considered a common carrier, even when the elevator is operated by an independent contractor). A common carrier by rail cannot exonerate itself of its duties by entering into a contract with another. *Peyton*, 106 Ill. at 540; see also *Gordon v. Chicago Transit Authority*, 128 Ill. App. 3d 493, 501, 470 N.E.2d 1163, 1169 (1984) (common carrier's duty to passengers is nondelegable). A common carrier may voluntarily place its engine and cars under the control of employees of another road, but this merely means that those employees are also deemed to be the servants of the first common carrier. *Peyton*, 106 Ill. at 540-41. There is no rule precluding joint liability in such a case. *Peyton*, 106 Ill. at 541-42.

■ Moreover, this court has held that Chicago Transit Authority (CTA) ticketholders had a contractual relationship not only with the CTA, but also with the Regional Transportation Authority (RTA), where the RTA was statutorily authorized to enter into financial grant agreements with the CTA and had the authority to determine fares. *Burns*, 112 Ill. App. 3d at 470, 445 N.E.2d at 352, *rev'd on other grounds, Stack v. Regional Transportation Authority*, 101 Ill. 2d 284, 461 N.E.2d 969 (1984). In this case, the record shows that the defendants have a similar relationship as existed in *Burns*. In addition, Mogan testified that Metra and CNW had a cooperative safety effort.

The record also shows that the train cars and the uniforms of the train crews bore Metra insignia. The ticket Barton held was a Metra ticket. Defendants assert that plaintiff avoided any claim of apparent agency, due to Metra's claim of statutory immunity (which is discussed below). However, the issue of duty is separate from that of immunity. Defendants have not explained why these undisputed facts are not relevant to show that Metra was a common carrier as to Barton.

■ The cases defendants cite in their brief on the question of duty are inapposite. Most of them do not involve common carriers; none overrule *Peyton* and its progeny.[12] Thus, we conclude that Metra was a common carrier as to Barton and was bound to exercise a high degree of care toward her, including the responsibility to prevent injuries that could have been reasonably foreseen and avoided. *E.g., Letsos v. Chicago Transit Authority*, 47 Ill. 2d 437, 441, 265 N.E.2d 650, 653 (1970).

Defendants next argue that Metra is immune from liability under section 5.03 of the RTA Act (70 ILCS 3615/5.03 (West 1998)) for acts or omissions of CNW as a result of Metra having a PSA with CNW.[13] Section 5.03 immunizes Metra against vicarious liability for claims such as those at issue in *Goertz v. Chicago & North Western Ry. Co.*, 19 Ill. App. 2d 261, 267-68, 153 N.E.2d 486, 489-90 (1958), which held that the servants in charge of the train were required to exercise due care to know that a passenger was attempting to deboard the train

---

[12]Defendants note that the PSA states that CNW is an independent contractor. Although Metra cannot shed its duties as a common carrier, we note that the parties' description of their relationship in a contract is not always controlling. Drivers of taxicabs (which are common carriers) may be employees of the company leasing the taxicabs, given indicia of control and the economic reality of the situation. See, *e.g., Morgan Cab Co. v. Industrial Comm'n*, 60 Ill. 2d 92, 324 N.E.2d 425 (1975) (and cases cited therein).

Moreover, an employer of an independent contractor may be held liable if, through the exercise of reasonable care, it should have known that the work was being carried out in a dangerous manner, and had an opportunity to prevent injury by the exercise of the power of control it retained, but took no action. *Pasko v. Commonwealth Edison Co.*, 14 Ill. App. 3d 481, 488, 302 N.E.2d 642, 648 (1973). Exhibit 2-C to the PSA plainly states that the contract services shall be performed in accordance with "any other standards established by the [RTA] pursuant to Section 2.04," despite defendants' omission of that language from the quotations in their briefs. Indeed, Metra is authorized by law to establish, enforce and maintain safety standards for public transportation it provides through PSAs. See 70 ILCS 3615/2.11, 2.20 (West 1998). Metra failed to do so, even though it used the second look system on lines it operated directly.

The right to change safety standards also disposes of the argument that proximate cause was lacking, which was based on the premise that "CNW did not have to take Metra's advice."

[13]As we presume that the legislature did not intend a meaningless act, section 5.03 of the RTA Act suggests that the legislature believed that the RTA otherwise could be held liable when providing public transportation by entering into a PSA. Section 5.03 also provides that the RTA is not barred from agreeing to pay such claims, as Metra apparently did in the PSA here.

before they started it. Metra relies on *Rascher v. City of Champaign*, 262 Ill. App. 3d 592, 596, 634 N.E.2d 1121, 1123 (1994), which rejected a plaintiff's attempt to avoid the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (Ill. Rev. Stat. 1991, ch. 85, par. 2—105) by pleading that a duty to warn of hazards discovered during an inspection was separate from the duty to inspect. In this case, Metra's liability does not result from omissions by CNW, but from Metra's independent failure to establish the second look system on the CNW line as it had on the lines it operated directly.

■ Defendants argue that the trial court erred in denying Metra leave to amend its answer to claim that its failure to recommend the second look system was a policy decision or discretionary act protected by the Tort Immunity Act. See 745 ILCS 10/2—109, 2—201 (West 1998). Generally, at any time prior to final judgment, amendments may be allowed to add new defenses on just and reasonable terms. 735 ILCS 5/2—616(a) (West 1998). Whether to allow an amendment is within the discretion of the trial court. *Carlisle v. Harp*, 200 Ill. App. 3d 908, 915, 558 N.E.2d 318, 322 (1990). Where the facts sought to be alleged are known to the party at the time of a prior pleading and no good reason is offered for failing to amend at that time, leave to amend is properly denied. See *Carlisle*, 200 Ill. App. 3d at 915, 558 N.E.2d at 322. An untimely pleaded defense cannot be considered, even if the evidence suggests it exists. *Carlisle*, 200 Ill. App. 3d at 916, 558 N.E.2d at 323.

■ The trial court ruled that Metra had waived the Tort Immunity Act defense, as it was first raised postverdict. Metra argues that it was responding to plaintiff's fifth amended complaint, which was filed on the day the jury returned its verdict. However, Barton's third amended complaint, filed in October 1998, alleged that Metra failed to adopt the second look system. The Tort Immunity Act could have been asserted at that time. Thus, there was no abuse of discretion.

## IV

■ Defendants also seek a new trial, contending that the verdict was against the manifest weight of the evidence. A judgment is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary or not based upon the evidence. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 242, 665 N.E.2d 1260, 1274 (1996). In an appeal from a jury verdict, a reviewing court may not reweigh the evidence and substitute its judgment for that of the jury. *Rhodes*, 172 Ill. 2d at 242, 665 N.E.2d at 1274.

Defendants assert that "plaintiff *necessarily had to have held the doors open as she descended*" for the accident to occur, but they point to no testimony or evidence in the record to this effect.

Defendants claim that the jury's allocation of fault was against the manifest weight of the evidence because the strap on the violin case was 45½ inches long. Defendants' brief asserts that "[i]t is uncontroverted that the strap could readily have been removed," but this assertion is blatantly false, given Barton's testimony as recited above. Defendants also state that Barton's counsel acknowledged there was "evidence of 'sufficient slack.' " The record shows that during a side-bar, Barton's counsel accepted that defendants' expert had so opined, which is not a stipulation or judicial admission that there was in fact sufficient slack on the strap for Barton to free herself. The expert testimony may have raised a question of fact, but given Barton's testimony and the demonstrative evidence, we cannot conclude that the verdict was against the manifest weight of the evidence.

The same rule applies to defendants' assertion that Barton had sufficient time to free herself before the train started moving, but chose not to free herself because she did not want to let go of the violin. Defendants' experts opined that Barton had time to free herself. The record disclosed the value of the violin. The record discloses that when McCarthy and Tuck arrived to aid Barton, she asked about the violin. The record contains testimony from an emergency room doctor that Barton said that she went back to get her violin (and that she was alert when she said it).

However, Barton also testified as to what she did before the train started moving and why she did not feel endangered at that time. Barton testified that after the incident, she kept talking, asking people to call MCNS to say she would not be coming, and so forth, in order to remain calm. McCarthy, who the record shows had the presence of mind to stop the train, open its doors and rush to Barton's aid, testified that he brought the violin with him. Neither party explains why McCarthy did so. The jury also heard evidence of the Anna Mae Gibson incident, in which, after Gibson was pulled into the train, she asked the conductors if they could retrieve her shoes. The parties do not appear to have focused on the value of Gibson's shoes.

The jury heard this evidence. The jury could reasonably have concluded that the evidence showed that in traumatic episodes like these incidents, the people involved may do or say things which, in hindsight, seem odd. The jury could reasonably have concluded that the victims in such incidents may focus on things that seem unimportant in hindsight, but represent an attempt to regain control over their circumstances or to fend off hysteria. Barton's comment to the

emergency room doctor that she "went back" to get her violin implies that it was left behind, which was obviously not the case at the point where Barton was attached to the train. Defendants point to no evidence that she had left the violin case and reboarded the train to retrieve it. Barton's comment might refer to her initial difficulty when the violin case became caught on poles at the top of the vestibule, but such speculation only demonstrates the ambiguity that confronted the jury.

█ In sum, the jury weighed opposing evidence and concluded that Barton was 4.5% at fault. That verdict reflects the jury's judgment that while Barton bore some responsibility, her injuries were not primarily the result of a desire to hang on to the violin case. Given the record in this case, defendants have failed to show that the jury's conclusion was unreasonable, arbitrary or not based upon the evidence in this respect. The cases defendants cite wherein Illinois courts have found the allocation of fault against the manifest weight of the evidence are factually distinguishable, even from the descriptions provided in defendants' brief. See, *e.g.*, *Johnson v. O'Neal*, 216 Ill. App. 3d 975, 987, 576 N.E.2d 486, 495 (1991) (allocation of 72.6% of fault to passenger for failing to leave a speeding vehicle was untenable in light of driver's negligence).

█ Defendants claim that the allocation of fault must be attributed to trial error. Defendants claim that Barton's expert was not qualified.[14] Defendants cite *Jones v. O'Young*, 154 Ill. 2d 39, 607 N.E.2d 224 (1992), and its progeny, but those cases involve the qualification of medical experts, particularly the "school of medicine" rule, which is not at issue here. An expert witness is a person who, because of education, training or experience, possesses specialized knowledge beyond that of the average person on a factual matter material to a claim or defense in the litigation. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 459, 605 N.E.2d 493, 504 (1992). Whether a witness is qualified to testify as an expert rests within the sound discretion of the trial court. *Schaffner v. Chicago & North Western Transportation Co.*, 129 Ill. 2d 1, 36, 541 N.E.2d 643, 658 (1989).

█ The record shows that Finan was a former NTSB accident investigator and was currently certified by the Federal Railroad Administration as an operating practices inspector. Finan testified that he investigated accidents on a number of systems, including the

---

[14]Barton claims waiver based on defendants' failure to renew their objection after cross-examining Finan, but the transcript shows that defendants were not permitted to cross-examine Finan on his qualifications before he gave his opinions.

CTA, the New York subway system, and others that the record shows are commuter rail services. Finan had never investigated a door-closing incident, but this court has not required the degree of specificity in expertise that defendants suggest. See, *e.g.*, *Patel v. Brown Machine Co.*, 264 Ill. App. 3d 1039, 1056, 637 N.E.2d 491, 502 (1994). Finan's prior lack of familiarity with door-closing standards goes to the weight of his testimony, not his competency. See *Buford v. Chicago Housing Authority*, 131 Ill. App. 3d 235, 244, 476 N.E.2d 427, 435 (1985).

Defendants claim that Finan offered no testimony regarding the applicable standards of care and their alleged breach. The record shows that Finan offered such opinions. Indeed, the record shows that the defendants objected to many of them, when directed toward Metra.[15]

For example, defendants assert that Finan improperly testified that Metra was like a parent that needed to instruct its child, or was the parent company of CNW. Defendants objected at trial, based on Illinois Supreme Court Rule 213 (177 Ill. 2d R. 213), which generally requires that, upon written interrogatory, a party must disclose the subject matter, conclusions, opinions, qualifications and reports of a witness who will offer any opinion testimony. *Department of Transportation v. Crull*, 294 Ill. App. 3d 531, 536, 690 N.E.2d 143, 146 (1998). Rule 213 establishes stricter standards regarding disclosure than did the now-repealed Rule 220, which formerly governed expert witnesses. *Crull*, 294 Ill. App. .3d at 538-39, 690 N.E.2d at 148. However, elaborating on a disclosed opinion does not automatically violate Rule 213, where the testimony states logical corollaries to the opinion, rather than new reasons for it. See *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 23, 724 N.E.2d 115, 127-28 (1999). The trial court's ruling admitting the evidence will not be reversed absent an abuse of discretion. *Seef*, 311 Ill. App. 3d at 22, 724 N.E.2d at 126.

Finan's testimony that Metra had "a relationship to oversee their contractors, to make sure that their contractors are performing in a safe and efficient manner," may not be an opinion; Mogan testified that Metra conducted safety audits in cooperation with CNW. Finan's reference to a parent-child relationship, when read in context, refers to the fact that Metra owns and operates many lines, yet has a PSA with CNW as to this particular line. Finan elsewhere referred to the lines as sisters. Defendants failed to object to Finan's testimony that Metra was "remiss in [its] duties as the parent company" in their

---

[15]The record shows that defendants did not object at trial to Finan's alleged assertions that CNW must insure passenger safety, resulting in waiver on appeal.

posttrial motion, thus waiving the argument. 155 Ill. 2d R. 366(b)(2)(iii).[16]

Defendants claim that prior to trial, Finan opined only that the door light procedure was unsafe and that the prior incidents should have alerted defendants that there was a problem. However, Finan's May 21, 1998, report notes his test of the train at issue, which showed that the doors could be open as much as a foot when the door light was activated. Finan's report also states that defendants were aware of the SSOs. Finan's report states that Metra should have known of the difference in door-closing procedures. Finan found it "difficult to believe" that Metra and CNW waited until after the Barton incident to install the second look system, which Finan opined was the industry custom and standard. Finan's report concluded that defendants had

---

[16]Notwithstanding defendants' waiver, we note that an error in admitting evidence affecting the allocation of fault may require a new trial where it is probable that excluding it would have caused the jury to find that: (1) the plaintiff was more than 50% negligent, thus barring recovery under section 2—1116 of the Code of Civil Procedure (735 ILCS 5/2—1116 (West 1994)); (2) a defendant that was not found negligent had some culpability; or (3) a defendant was more than 25% culpable, giving rise to joint liability as to that defendant under section 2—1117 (735 ILCS 5/2—1117 (West 1994)). See *Regala v. Rush North Shore Medical Center*, 323 Ill. App. 3d 579, 584 (2001) (modified on denial of rehearing); *LoCoco v. XL Disposal Corp.*, 307 Ill. App. 3d 684, 695, 717 N.E.2d 823, 832 (1999); *Parker v. Illinois Masonic Warren Barr Pavilion*, 299 Ill. App. 3d 495, 504-05, 701 N.E.2d 190, 196 (1998). Defendants argue that *Regala* establishes a *per se* rule that the admission of an opinion in violation of Rule 213 requires a new trial. However, *Regala* was based in part on "the effect of the erroneous admission of *** undisclosed opinions," which does not create a *per se* rule. *Regala*, 323 Ill. App. 3d at 585. *Seef*, 311 Ill. App. 3d at 24, 724 N.E.2d at 128, also cited "the cumulative effect" of admitting the undisclosed opinions. In *Adami v. Belmonte*, 302 Ill. App. 3d 17, 24, 704 N.E.2d 708, 713 (1998), the trial court barred opinions prior to trial; this court affirmed, in part because the admission of the opinions would have prejudiced the defendant. *Regala*, *Seef* and *Adami* rely on *Crull*, 294 Ill. App. 3d 531, 690 N.E.2d 143, a Fourth District case. The Fourth District requires that a party show prejudice resulting from a Rule 213 violation to obtain a reversal. *Linn v. Damilano*, 303 Ill. App. 3d 600, 606, 708 N.E.2d 533, 537 (1999). The fourth, first and second divisions of the First District also require a showing of prejudice. *Mitchell v. Palos Community Hospital*, 317 Ill. App. 3d 754, 763-64, 740 N.E.2d 476, 483 (2000); *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 946, 738 N.E.2d 199, 211 (2000); *Parker*, 299 Ill. App. 3d at 503, 701 N.E.2d at 195. Given the verdict in this case, the alleged errors would not meet the criteria of *Regala*, *LoCoco* or *Parker*.

failed to take reasonable measures to ensure passenger safety, because it was known that CNW's procedure was producing injury, yet defendants failed to act.

Given this report, it could be inferred that Finan believed that the SSOs were caused by reliance on the door light system, both in theory and as tested on the train car at issue. It could also be inferred that Finan believed that both defendants had a duty to recognize the problem and breached their duty of care by not implementing the second look system. Thus, the trial court did not abuse its discretion in admitting Finan's testimony.

■ Defendants object to the admission of videotape, along with stills taken therefrom and Finan's explanatory testimony, of the inspection of the train at issue. Defendants argue that the evidence lacked foundation, because Barton could not show that the train was in the same condition as it was at the time of her injury. At trial, the court overruled the objection, subject to Barton tying up later. Larson later testified that, barring some reported event, he would expect that the train was in the same condition it was at the time of the injury.

Defendants also objected that evidence showing that the door light went on while the doors were open 9 to 12 inches was irrelevant to show causation because the testimony showed that the doors were closed for 10 seconds before the train started to move. However, such evidence was relevant to show whether the defendants breached their duty by relying on the door light system.[17]

Defendants objected to evidence of the SSOs and CNW's responses to them, which was introduced to support the claim for punitive damages. As the trial court did not err in submitting that claim to the jury, the evidence was properly admitted, with one exception. Evidence that neither defendant disclosed Croghan as a witness is "not proper grist for an award of punitive damages." *Kopczick*, 308 Ill. App. 3d at 978, 721 N.E.2d at 779. However, *Kopczick* did not reverse the punitive damage award based on the introduction of evidence of discovery violations. Given the record here, defendants have not shown reversible error. See, *e.g.*, *Lee*, 152 Ill. 2d at 472, 605 N.E.2d at 510; *LoCoco*, 307 Ill. App. 3d at 695, 717 N.E.2d at 832.

Defendants have not shown that the verdict was against the manifest weight of the evidence.

## V

■ ■ Defendants contend that damages awarded in this case for

---

[17]Goosie later testified that the door light problem did not show up in the pretrip inspection, but such testimony merely created a question of fact for the jury to resolve.

pain and suffering, disability, and disfigurement are "excessive to an extreme." The determination of damages is a question generally reserved to the trier of fact; a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court. *Richardson v. Chapman*, 175 Ill. 2d 98, 113, 676 N.E.2d 621, 628 (1997). In this case, the record discloses that the jury not only observed Barton, but also was shown photographs regarding Barton's surgeries and disfigurement. For example, Dr. Dumanian's videotaped testimony regarding the tissue expansion surgeries apparently included enlarged pre- and postoperative photographs. The jury also was shown a "day in the life" videotape to demonstrate the extent of Barton's injuries and resulting limitations on her normal life activities. The transcript discloses that plaintiff's counsel used such material during closing argument.

Defendants have failed to identify where any of this material appears in the record on appeal. No videotape was included in the record on appeal. The transcript of proceedings reveals almost no detail of the "day in the life" videotape, as it was shown to the jury without sound. Moreover, while defendants have objected to the introduction of still photographs taken from the videotape of the inspection of the train car, and included a copy of one such photographic exhibit in their appendix, they did not identify where the exhibit appears in the record, further supporting the conclusion that the photographic exhibits were not included in the record on appeal.

Defendants, as the appellants, have the burden of presenting the court with an adequate record for review. *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 546-47, 662 N.E.2d 1248, 1258 (1996). Although Barton and others testified on the issue of noneconomic damages, some cases exemplify the cliche that "a picture is worth a thousand words"; much that sounds cold coming from a witness may be better conveyed by a photograph. *Parson v. City of Chicago*, 117 Ill. App. 3d 383, 390, 453 N.E.2d 770, 775 (1983); see *Edward Hines Lumber Co. v. Village of Villa Park*, 34 Ill. App. 3d 711, 716, 340 N.E.2d 339, 343 (1976). Accordingly, we conclude that we are foreclosed from addressing defendants' argument by their failure to provide this significant photographic and videotaped material on appeal. *Schoonover v. International Harvester Co.*, 171 Ill. App. 3d 882, 887, 525 N.E.2d 1041, 1044-45 (1988) (consideration of adequacy of damages foreclosed where appellant failed to include videotaped evidence depositions of his medical experts); see *People ex rel. City of Rockford v. City of Loves Park*, 47 Ill. App. 2d 286, 292-93, 198 N.E.2d 133, 137 (1964). The verdict was rendered by a jury which observed all of the evidence at trial. Defendants' posttrial motion failed to convince the trial judge,

who observed all of the evidence. On appeal, defendants cannot expect this court to substitute its opinion for that of the jury absent the photographic and videotaped material that so directly bears on the issue of noneconomic damages.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY, J., concurs.

JUSTICE O'BRIEN, dissenting in part and specially concurring in part:

What is the appropriate analysis and remedy for a violation of Supreme Court Rule 213?

James Finan, plaintiff's expert, was disclosed and deposed as a former NTSB accident investigator and an operating practices inspector certified by the Federal Railroad Association. His disclosed expertise and opinions concerned the physical capabilities and performance for the train doors in question and the safety rules and practices regarding the doors.

However, at trial Finan testified that Metra was like a parent not knowing what the child is doing, that Metra was "remiss in [its] duties as a parent company," that Metra had a "relationship to oversee [its] contractors, to make sure that [its] contractors are performing in a safe and efficient manner." These opinions, which speak to the relationship between Metra and CNW and to any duties of Metra and CNW, were not disclosed pursuant to Supreme Court Rule 213 and, thus, violated Rule 213.

The committee comments to Rule 213 state that, "in order to avoid surprise, the subject matter of all opinions must be disclosed pursuant to this rule *** and that no new or additional opinions will be allowed unless the interests of justice require otherwise." 177 Ill. 2d R. 213(g), Committee Comments. Upon written interrogatory, a party must disclose the subject matter, conclusions, opinions, qualifications and reports of any witnesses who will offer any opinion testimony and seasonably supplement any previous answers when additional information becomes known. *Department of Transportation v. Crull*, 294 Ill. App. 3d at 536-37.

The importance of an expert and the impact that expert has upon the trier of fact is undisputed. An expert is integral to a case because an expert can assist the trier of fact to understand evidence or to decide a fact in issue which is difficult to comprehend or to explain.

See generally: *Wojcik v. City of Chicago*, 299 Ill. App. 3d 964, 979 (1998); *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 365 (1992); *Chicago Title & Trust Co. v. Brescia*, 285 Ill. App. 3d 671, 682 (1996). Separate and unique discovery rules have been established in recognition of the significance of an expert. If separate and unique discovery exists for the disclosure of experts, should not the analysis and remedy for a violation of that disclosure differ from the analysis and remedy for a violation of other discovery rules?

Rule 213 establishes stricter standards regarding disclosure than did the now-repealed Rule 220. See generally *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d at 21; *Department of Transportation v. Crull*, 294 Ill. App. 3d at 538-39; *Adami v. Belmonte*, 302 Ill. App. 3d 17, 24 (1998). If a stricter Rule 213 replaced Rule 220, should not the analysis and remedy for a violation of Rule 213 require a stricter and different analysis than a violation of Rule 220?

We have answered "yes" in *Adami*, *Seef* and *Regala v. Rush North Shore Medical Center*, 323 Ill. App. 3d 579 (2001), and have moved from a "harmless" or "no prejudice" analysis employed in Rule 220 violations to a *per se* analysis as exhibited in *Regala*. And, although the majority cites *Regala* in a footnote and states that it does not establish a *per se* analysis, the *Regala* opinion, citing *Seef*, states otherwise. See *Regala*, 323 Ill. App. 3d at 384-86. The Rule 213 disclosure requirements are mandatory and subject to strict compliance by the parties. *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d at 21; *Department of Transportation v. Crull*, 294 Ill. App. 3d at 539; *Adami v. Belmonte*, 302 Ill. App. 3d at 24. The testimony of an expert is so powerful that any expert testimony at trial not previously disclosed is itself prejudicial and requires a new trial. See, *e.g.*, *Regala*, 323 Ill. App. 3d at 584-86. And, because Finan's testimony impacted upon the allocation of fault between Metra and CNW, a new trial as to both Metra and CNW should be granted.

Admittedly, this analysis is neither facile nor Mosaic but it appears consistent and equal; in *Regala*, plaintiffs were granted a new trial and here, defendants are requesting a new trial. Recognizing the difficulties with this analysis, the guidance of the supreme court is earnestly desired for the intermediate and trial courts so that the last days of Rule 220 and the reasons for its demise do not return.

Accordingly, I would reverse and remand this cause for a new trial on the Rule 213 issue. On all other issues, I concur.